VIDEOTAPED DEPOSITION OF SANDRA M. PACK

March 1, 2012


UNITED STATES DISTRICT COURT

SOURTHERN DISTRICT OF FLORIDA

MDL NO. 11-MD-0222-COHN/SELTZER


IN RE:   ENFAMIL LIPIL MARKETING      :
         AND SALES PRACTICES          :
         LITIGATION                   :
                                      :
----------------------------------- : No. MDL-2222
                                      :
This Document Relates to:             :
                                      :
Nelson v. Mead Johns & Company,       :
LLC                                   :
No. 09-61625-CIV-COHN/SELTZER         :
                                      :
                                      :


APPEARANCES:

        FOR CLASS MEMBER SANDRA M. PACK:

        James H. Price, Esq.
        Lacy, Price & Wagner
        249 North Peters Road, Suite 101
        Knoxville, Tennessee 37923

        FOR THE PLAINTIFFS:

        Van Bunch, Esq.
        Bonnett, Fairbourn, Friedman & Balint
        2901 N. Central Avenue, Suite 1000
        Phoenix, Arizona  85012

REPRINTED
ORIGINAL

2

APPEARANCES:   (Continued):

        FOR THE DEFENDANT:

        Gail L. Gottehrer, Esq.
        Axinn, Veltrop, Harkrider
        90 State House Square
        Hartford, Connecticut  06103-3702


        ALSO PRESENT:

                Matt Poplin, videographer

STOGSDILL  COURT  REPORTING  SERVICES

3

I N D E X

Page No.

Examination,
     By Mr. Bunch ------------------------- 6



E X H I B I T S

Exhibit No. 1,
     Subpoena --------------------------- 21

Exhibit No. 2,
     Statement of objection -------------- 22

Exhibit No. 3,
     10/3/11 document to Tim Blood from
     Allen McDonald ---------------------- 32

STOGSDILL COURT REPORTING SERVICES

4

1                    S T I P U L A T I O N

2              The videotaped deposition of SANDRA

3    M. PACK, called as a witness at the instance of the

4    Plaintiffs, pursuant to all applicable rules, taken

5    by agreement on the 1st day of March, 2012, beginning

6    at 4:07 p.m., at the law offices of Lacy, Price &

7    Wagner, 249 North Peters Road, Suite 101, Knoxville,

8    Tennessee, before Andrea F. McBee, Court Reporter and

9    Notary Public, pursuant to the stipulation of

10   counsel.

11              It being agreed that

12   Andrea F. McBee, Court Reporter and Notary Public,

13   may report the deposition in machine shorthand,

14   afterwards reducing the same to typewriting.

15              All objections, except as to the form

16   of the question, are reserved to on or before the

17   hearing.

18              It being further agreed that all

19   formalities as to notice, caption, certificate,

20   transmission, etc., including the reading of the

21   completed deposition by the witness and the signature

22   of the witness, are waived.

23

24

25

STOGSDILL COURT REPORTING SERVICES

5

1              THE VIDEOGRAPHER:  Today is March

2       the 1st, 2012.  The time on our video

3       monitor is 4:07 p.m.  This is the deposition

4       of Sandra Pack, being taken in the Enfamil

5       LIPIL Marketing and Sales Practices

6       Litigation.  It relates to Nelson versus

7       Mead Johns & Company, LLC.  It's in the

8       United States District Court, Southern

9       District of Florida.  My name is Matt

10      Poplin; I'm the videographer.  Our court

11      reporter today is Ms. Ann McBee.  And the

12      case number is MDL-2222.  The attorneys may

13      identify themselves on the record at this

14      time.

15              MR. BUNCH:  Van Bunch, Bonnett,

16      Fairbourn, Friedman & Balint, for the

17      plaintiffs.

18              MS. GOTTEHRER:  Gail Gottehrer,

19      Axinn, Veltrop and Harkrider, for the

20      defendant.

21              MR. PRICE:  Jim Price, Lacy, Price

22      & Wagner for Mrs. Pack.

23

24

25

STOGSDILL  COURT  REPORTING  SERVICES

6

```
 1                    SANDRA M. PACK,
 2     called as a witness at the instance of the
 3     Plaintiffs, having been first duly sworn, was
 4     examined and deposed as follows:
 5                    EXAMINATION
 6     BY MR. BUNCH:
 7          Q         Good afternoon, Mrs. Pack.  Would
 8     you state your name for the record, please?
 9          A         Sandra M. Pack.
10          Q         And your present address?
11          A         2712 Century Drive, Maryville,
12     Tennessee.
13          Q         Have you recently relocated to
14     there?
15          A         Yes.
16          Q         Have you ever sat for a deposition
17     before?
18          A         No.
19          Q         Have you had your lawyer explain
20     to you what a deposition is used for in litigation,
21     or do you want me to do that for you?
22          A         We didn't necessarily talk about
23     it, but I sort of know, but if you want to explain
24     you may.
25          Q         Okay.  Well, you know, the court
```

7

1   reporter just swore you in.

2          A          Yeah.

3          Q          And even though we're here in a

4   nice conference room you're, for all intents and

5   purposes, on a witness stand, and the video camera

6   over there, for all intents and purposes, is the

7   judge, the jury, whoever is ending up being the

8   person who makes the decision in the case, okay?

9          A          Okay.

10          Q          So your testimony is just as it

11   would be if you're going to go and testify about your

12   objection in this case to a judge, for example.  And

13   in order for that testimony to be clear and

14   understandable to the judge and on the record we have

15   a court reporter here who takes it down, and she

16   takes down what I say and then she takes down what

17   you say, and she can't do it if we're talking at the

18   same time.  So try to figure out when my question is

19   over and when it is, then you can answer, and then

20   I'll try to do the same for you, okay?

21          A          Absolutely.

22          Q          If you don't understand my

23   question ask me to rephrase it, because when you

24   provide an answer we're going to assume that you

25   understood the question and are answering it to the

8

1    best of your knowledge at the time, okay?

2             A        Okay.

3             Q            Even though in every day

4    conversation people use uh-huh and huh-uh and head

5    nods and shakes to communicate, because we're on a

6    written record the court reporter needs words, and as

7    a matter of fact, huh-uh and uh-huh are spelled the

8    same way, even though they mean two different things.

9    So you need to use yes and no and not head shakes and

10   such, okay?

11            A        Yes.

12            Q            And I don't think we're going to

13   be here very long or try not to be here very long,

14   especially since you have two little kids that you

15   need to get back to, but if you do need a break at

16   sometime just say so and we'll take a break, other

17   than when a question is pending, okay?

18            A        Yes.

19            Q            That's the one difference between

20   this and being in a witness stand.  You don't get to

21   ask the judge for a break in a witness stand.  So how

22   long have you lived in Maryville?

23            A        A week.

24            Q        Where do you teach school?

25            A        South Doyle Middle School.

9

1    Q        So that's sixth through eighth
2    grade?
3    A        Yes.
4    Q        How long have you worked -- taught
5    there?
6    A        Roughly 15 years.
7    Q        Do you teach Mr. Price's children
8    or something?  How do you know Mr. Price?
9    A        No.  We just met.
10   Q        Today?
11   A        Yes.
12   Q        How is it that you came to be an
13   objector in the Enfamil case?
14                MR. PRICE:  I'm going to object to
15           the relevance of the question, but go ahead
16           and answer his question.
17                THE WITNESS:  I've seen -- I've
18           seen things about just random cases like
19           that, and this one particularly interested
20           me because it does apply to me.
21   BY MR. BUNCH:
22   Q        And what led to your becoming a
23   participant in the case as an objector?
24   A        Probably the fact that I just --
25   like I said before, it -- this case in particular I

```
                                                        10

1    had, I actually had a part of, to me.  Does that make

2    sense?

3              Q         Sure.  You fed Enfamil to your

4    child.

5              A         Yes.

6              Q         But my question is, how did you

7    learn about the case and then make contact with a

8    lawyer about objecting to the settlement in the case?

9                   MR. PRICE:  I'm going to object to

10                  any questions that relate to any

11                  attorney/client privileged information that

12                  you may be asking about.

13                  MR. BUNCH:  Sure.

14   BY MR. BUNCH:

15             Q         I'm not asking you to tell me

16   anything that a lawyer told you in the nature of

17   advice.  I'm asking you how it came to be that you

18   retained this law firm to file an objection on your

19   behalf in this case.

20                  MR. PRICE:  And if you're asking

21                  how she found out about us -- let's just cut

22                  to the chase.  Her brother is one of my

23                  lawyers, so that's how she came to know

24                  about our firm.

25                  THE WITNESS:  Yeah.
```

STOGSDILL COURT REPORTING SERVICES

11

1   BY MR. BUNCH:

2           Q          You had an existing relationship

3   with a lawyer at the firm because he's your brother,

4   right?

5           A          Yes.

6           Q          Did he call you up and tell you

7   about the --

8           A          No.

9           Q          -- Enfamil case?  How did it come

10  to be that you decided to file an objection to the

11  firm in the case?

12          A          I actually -- and I can't tell

13  you, to be honest, where I saw it.  I've seen stuff

14  randomly on the internet, on TV where you see if

15  you've been a part of this -- I've seen stuff in

16  Parade magazine.  I've seen -- various places.  Where

17  I actually first heard about this I could not tell

18  you.  I do not remember.  But I did -- can I

19  continue?

20                     MR. PRICE:  Uh-huh.

21                     THE WITNESS:  I just don't want to

22         over answer the question.

23                     MR. BUNCH:  That's okay.

24                     THE WITNESS:  But I did contact my

25         brother and ask him if he was familiar with

12

1          any of this, and then I've looked into it,

2          and I have spoken to him about it, so --

3    BY MR. BUNCH:

4          Q          So you -- the -- you heard about

5    the case through the media or otherwise and reached

6    out to your brother, the lawyer at this firm, to

7    discuss the case with him; is that right?

8          A          Yes.

9          Q          What's his name?

10         A          Wallace McDonald.

11         Q          Do you recall when it was that you

12   made the contact with him about the case?  The

13   emphasis is on when, not what you said or anything.

14         A          I don't.  I'm sorry.  I don't.

15         Q          Okay.  Have you read any of the

16   papers relating to the case?

17         A          No, only on the internet.  I've

18   just looked things up, but I've seen nothing

19   paper-wise.

20         Q          Did you see -- when you say

21   internet, did you look it up on the website that's

22   set up for the settlement of this case?

23         A          I did see that, yes.

24         Q          Did you see that before or after

25   you talked to your brother about what was going on

13

1    with the case?

2          A          I don't recall.

3          Q          It's kind of a chicken and an egg

4    thing, you know, which came first.  Did you read

5    about the settlement and then talk to your brother,

6    or had you already talked to your brother and then

7    read about the settlement?

8                     MR. PRICE:  Object, asked and

9          answered.

10   BY MR. BUNCH:

11         Q          You can answer it.

12         A          I think I just answered and said I

13   don't recall.

14         Q          Is there something that you could

15   use to refresh your recollection to help you get that

16   sense of timing down?

17         A          Probably not, no.  I mean, I don't

18   know what I would -- I don't know what I would look

19   at or recall back to to remember that, no.

20         Q          You mentioned Parade magazine; is

21   that what you said?

22         A          I said I've seen things, not

23   necessarily this, because I mean, I, like you, see

24   things every single day, so where I actually saw

25   this, I don't remember if it was -- but I've seen

STOGSDILL COURT REPORTING SERVICES

14

1  them in there, I mean, many different advertisements

2  for different things, if you were involved with this

3  call this, if you've done this do this.

4          Q          Right.  But some of those things

5  are solicitations, you know, Attorney James Sokolove,

6  if you've taken some drug, call me up and I'll refer

7  you to somebody that's handling this case for

8  pharmaceuticals.  That's one thing.  But another

9  thing you see in the media is a notice of a

10  pending -- it's called a notice of pendency of

11  settlement or something like that.  Which do you

12  recall seeing, somebody soliciting for you to

13  participate in a case or somebody telling you about a

14  case that was already settled?

15          A          I don't really remember.

16          Q          In your review of the materials on

17  the internet, did you read the notice of the

18  settlement, of the proposed settlement of the class

19  action and learn about your right to object to it?

20          A          One of the things that I saw was,

21  which -- and timeline or which came first, I probably

22  can't say, but I saw an offer for one can of Enfamil,

23  I think, or two, or something like that, and I

24  remember that bothering me.

25          Q          What bothered you about it?

STOGSDILL COURT REPORTING SERVICES

15

```
1           A        Many things.
2           Q        Okay.  I'm here to let you tell us
3    what those are.
4           A        Okay.  Well, first of all, I feel
5    that, I guess I would call it your client or your
6    client, I suppose, Enfamil, or whoever makes it --
7                     MR. BUNCH:  That would be her
8             client.
9                     THE WITNESS:  Okay.  I feel like
10            that as a parent they, I guess I should say,
11            were praying on people who are in a
12            vulnerable state.  If I just gave birth to a
13            child and I'm standing there making a
14            decision based on what you have said, your
15            offering, and I make a choice based on what
16            you've said, I -- I was bothered by that,
17            once I find out that that was not true.
18            That's one reason why that bothered me.
19            Secondly, I feel like that at the time I was
20            in a state where I would have made a
21            different decision on purchasing that
22            product had that not been stated the way
23            that it was stated.  I also feel that doing
24            what I do for a living -- I see kids every
25            day who are not as fortunate as any of us
```

16

1          sitting in this room, and when I say that

2          I'm talking about their intelligence level

3          and where they are, and that bothered me,

4          because I feel like that I did what I

5          thought was best for my child based on what

6          you said.  So there are -- the top of my

7          list of why I feel that that is wrong.

8   BY MR. BUNCH:

9          Q          Those are many of the same reasons

10  why we as lawyers for purchasers of Enfamil sued Mead

11  Johnson in the first place.

12         A          Okay.

13         Q          And we started off talking about

14  this because you -- you said something that you saw

15  related to your opportunity to get one or two cans of

16  Enfamil.  Did something about that bother you?

17         A          Well, yes, I don't need one or two

18  cans of Enfamil, and I just feel like that's not -- I

19  don't think that that -- I don't think that that

20  fixes the problem.

21         Q          Are you saying, then, that the

22  settlement needs to be enriched somehow beyond just

23  the cans of Enfamil?  Is that what you understand the

24  settlement to be for?

25         A          I feel it's more about the fact

17

1   that it was a -- I feel like it was more about the

2   fact that it was a blatant lie.  I mean, whatever the

3   settlement is is what it is, but I feel like that's a

4   lie, what they did.

5           Q        Right.  But do you know what the

6   objections to the settlement filed on your behalf

7   were?

8           A        I believe that I'm objecting to

9   what their offer was.

10          Q        Have you ever read any documents

11  relating to your objection that were filed with the

12  court?

13          A        I have come to them to do those

14  for me.

15          Q        Right.  So the question, though,

16  is have you ever read them?

17          A        No.

18          Q        Have you ever seen it?

19          A        No.

20          Q        Then what is your understanding of

21  the objection beyond, if there is one, beyond you

22  don't think that they're doing enough?

23          A        Repeat that.

24          Q        Just tell me what you understand

25  to be the objections that were filed in the federal

18

1   court that's handling this case on your behalf that

2   represent your views about the settlement.

3                    MR. PRICE:  I'm going to object to

4        the form of the question.

5   BY MR. BUNCH:

6        Q       Do you want me to restate it?

7        A       Yes, because obviously I'm not

8   understanding exactly what you're wanting me to

9   answer.

10       Q       Do you know that this law firm

11  filed a document in federal court on your behalf

12  objecting to the settlement in this case on behalf of

13  Enfamil purchases?

14       A       Yes.

15       Q       You do know that?

16       A       Yes.

17       Q       What do you understand that

18  objection to be?

19       A       That I'm -- my understanding is

20  that I'm disagreeing to what offers have been made.

21       Q       Anything else?

22       A       Not to my knowledge.  I mean --

23  and I may -- I mean, I may be not understanding your

24  question.

25       Q       Have you read the document that

STOGSDILL COURT REPORTING SERVICES

19

1  the court authorized to be sent out to purchasers of

2  Enfamil describing the settlement that is proposed in

3  this case?  It's called a notice, a class action

4  notice.

5          A          I have not read it.  Like I said,

6  that's why I've come to them to do that.  I know that

7  -- and I'm going through my head trying to remember

8  anything that we've discussed about this where they

9  have said here's what -- the only thing that I

10 believe that is coming to my head is that there's an

11 offer for something along, something going to

12 charity, things going to charity maybe, and that's

13 come to my head.  Like I said, I'm sitting here

14 trying to remember, because I know that -- that's

15 what's coming to my head.

16         Q          Okay.  What is your understanding

17 of your role in the lawsuit?

18                    MR. PRICE:  I'm going to object to

19             the relevance of the question.  When Mr.

20             Wright asked us to get together for a

21             deposition, I made it clear to him that what

22             we were here to do today is to ask her

23             questions related to the efficacy of a bond,

24             and we've gone -- I've let you go on and on

25             about other areas, and we need to get to the

20

1    point and ask her questions related to the

2    bond, or we'll go ahead and stop the

3    deposition.  That's what we're here for.

4              MR. BUNCH:  Well, as you know -- I

5    mean -- and we don't need to get in too much

6    colloquy about this because it's not even

7    supposed to happen, but in this instance

8    I'll share this with you.  Your firm and the

9    plaintiffs' lawyers, or even the joint

10    motion filed for the bond, both relied on

11    the same four factor analysis, one of which

12    is the merits of the appeal, and so I'm

13    entitled to ask her what she understands

14    those merits to be, because if in fact she

15    indicates something that undercuts the

16    merits of your objection, that goes to

17    whether a bond should be imposed.

18              MR. PRICE:  I don't think that's

19    correct, Van.  And as I told Will when he

20    called me and asked me about this, I told

21    him and sent it to him in writing.  If you

22    want to ask her about the efficacy of the

23    bond, that's fine.  Otherwise we're going to

24    stop the deposition, so that's totally up to

25    you.

21

1          MR. BUNCH:  Well, I'll just
2     continue on and you can do what you think is
3     appropriate.  How about that?  Let me mark
4     something.  Let me mark this first.
5                    (Thereupon, the respective
6                    document was marked
7                    Exhibit No. 1.)
8  BY MR. BUNCH:
9          Q        Mrs. Pack, this has been marked as
10  Exhibit 1 to your deposition.  Have you ever seen
11  that document before?
12          A        I don't believe so.
13          Q        That's a subpoena that your
14  brother's law firm or your law firm agree to accept
15  on your behalf for you to show up here today to sit
16  for your deposition.  That's a court document.
17                   MR. PRICE:  She just said she
18              didn't see it.
19                   MR. BUNCH:  I'm just telling her
20              what it is.
21  BY MR. BUNCH:
22          Q        Did you bring any papers with you
23  today?
24          A        No.
25                   MR. BUNCH:  Can you mark that,

22

1      please?

2                          (Thereupon, the respective

3                          document was marked

4                          Exhibit No. 2.)

5                  MR. BUNCH:  This is the objection.

6                  MR. PRICE:  And as she said, she's

7      not read the objection.

8  BY MR. BUNCH:

9      Q      Mrs. Pack, that's Exhibit 2 to

10 your deposition.  Have you ever seen that document

11 before?

12     A      No.

13     Q      Would you turn to the very last

14 page of the exhibit?

15     A      All right.

16     Q      Is that your signature?

17     A      Yes.

18     Q      Do you see what it says under

19 "signature of class member/objector?"  Did you read

20 that before you signed it?

21     A      Yes.

22     Q      Had you read the instructions for

23 filing objections that are referenced in that

24 statement above your signature?

25     A      Did I read that?

23

1        Q        Have you read something called
2   instructions for filing objections, as stated in that
3   language above your signature?  It reads, "Pursuant
4   to the instruction for filing objections In Re:
5   Enfamil LIPIL Marketing and Sales Practices
6   Litigation."  Have you ever read anything that are
7   called instructions for filing objections?
8        A        No.
9        Q        The next to the last page of that
10  Exhibit 2 is a claim form.  Is that your signature in
11  the lower left-hand corner?
12       A        Yes.
13       Q        Is this your handwriting on this
14  document?
15       A        I signed the bottom.
16       Q        Did you read it before you signed
17  it?
18       A        Yes.
19       Q        It says in item D, "Which of the
20  following settlement benefits do you want to
21  receive?"  And you checked -- or it is checked cash.
22       A        Yes.
23       Q        Is that the settlement benefit you
24  want to receive?
25       A        I have no need for Enfamil, so --

STOGSDILL COURT REPORTING SERVICES

24

1          Q          Okay.  And how much cash do you
2    think you're going to get?
3          A          I'm not -- it's not about that at
4    all.
5          Q          What's it about?
6          A          I answered your question earlier,
7    I think.
8          Q          Do you know how much cash is
9    proposed to be paid to all the purchasers of Enfamil?
10         A          No.
11         Q          Is there an amount of compensation
12   made through payment of money that you think is
13   sufficient to address your concern about the
14   information, the wrong information you received by
15   Enfamil?
16                    MR. PRICE:  We're going to stop
17              the deposition right now.  Van, I told you
18              that we were here to talk about the bond.
19              And I was nice about it and I'm continuing
20              to be nice about it, but you are continuing
21              to go beyond the issue of the bond.  You had
22              an opportunity to make a record at the trial
23              level and you didn't do that, so unless you
24              are going to ask questions specifically
25              about the bond, we're going to stop the

25

1            deposition now.

2    BY MR. BUNCH:

3            Q            Well, let me ask you some

4    questions about the bond, then.  Do you know what a

5    bond is?

6            A            I believe it was explained to me.

7            Q            And you understand -- you're

8    comfortable with the explanation that was given to

9    you?

10           A            I believe so.

11           Q            Okay.  Do you have an agreement in

12   writing with this law firm that states the terms and

13   conditions of their representing you in the case?

14           A            No, I have signed nothing with

15   them, no contract.

16           Q            Do you have an expectation that

17   you're going to pay attorneys' fees to them for

18   representing you in connection with your objection?

19                        MR. PRICE:  And I'm going to

20           object to any agreement that we have with

21           our client.

22                        MR. BUNCH:  On what basis?

23                        MR. PRICE:  That's attorney/client

24           privilege.  That's not any of your business,

25           what our agreement is with her.

26

1            MR. BUNCH:  Well, if she's not --
2       if you haven't complied with the
3       technicalities of engaging an
4       attorney/client relationship with your
5       client, then you don't have one.
6            MR. PRICE:  That's not true.  We
7       have a relationship with her, and we're not
8       disclosing what our relationship is with her
9       to you.  It's not any of your business.
10  BY MR. BUNCH:
11       Q        Is it your understanding that if
12  the judge imposes a requirement that you post a bond
13  in order to maintain your appeal in this case, that
14  you are going to be responsible for posting that
15  bond?
16       A        If I'm understanding you, then I
17  believe my answer is yes.
18       Q        Do you know how much the bond is,
19  in terms of how much the parties in the case are
20  suggesting to the judge, that you have to put up?
21       A        I believe so.
22       Q        What number is that?
23       A        I believe that they asked me if I
24  had $70,000; is that correct?
25       Q        I'm just asking you what your

27

1    understanding --

2            A           That's my understanding.

3            Q           Something like $70,000?

4            A           Some absurd number, yes.

5            Q           Have you looked into whether you

6    could provide a bond of that character?

7            A           Yes.

8            Q           And could you?

9            A           Absolutely not.

10           Q           Have you talked to bonding

11   companies?

12           A           No.

13           Q           Do you think you have to put up

14   $70,000 in cash in order to meet the requirements of

15   posting a bond?

16           A           I would assume on -- I'm going to

17   -- I don't know.  I'll say I don't know.

18           Q           Have your lawyers agreed to put it

19   up for you?

20           A           No.

21           Q           Have you consulted with a

22   financial advisor in coming to the conclusion that

23   you don't have sufficient assets to post a $70,000

24   bond?

25           A           No.

28

```
 1        Q         Did you just buy a new house?
 2        A         No.
 3        Q         Are you buying the house that you
 4  live in?
 5        A         No.
 6        Q         You're renting?
 7        A         No.
 8        Q         You're living with your parents?
 9        A         In-laws.
10        Q         Okay.  What assets do you have
11  available to put up to secure a bond?
12              MR. PRICE:  And that's assuming
13          that you have any.  That's a question that
14          assumes that you have some.
15              THE WITNESS:  By assets, do you
16          mean what do I own?
17              MR. BUNCH:  Sure.
18              THE WITNESS:  I own nothing in my
19          outright.
20  BY MR. BUNCH:
21        Q         You and your husband own property
22  together as marital property?
23        A         No.
24        Q         You don't own a house or a car?
25        A         I make payments on a car.  I
```

STOGSDILL COURT REPORTING SERVICES

29

1   assume I don't own it.

2          Q       So your only source of income is

3   your salary as a teacher at Doyle Middle School?

4          A       South Doyle Middle School, yes.

5          Q       South Doyle.  Is there a North

6   Doyle?

7          A       No.

8          Q       Is there an east or west?

9          A       No.

10          Q       Okay.  But that's your only source

11   of income?

12          A       Yes.

13          Q       Has your -- is your husband behind

14   your effort in the case to the extent that he's

15   willing to provide whatever assets he has to secure a

16   bond?

17                  MR. PRICE:  And again, that

18          assumes he has any.

19                  THE WITNESS:  I was wondering what

20          you're talking about, because we own

21          nothing, either one of us.  He pays on his

22          car just like I do.

23   BY MR. BUNCH:

24          Q       You have no cash in the bank?

25          A       Let me look at the date.  Today is

STOGSDILL COURT REPORTING SERVICES

30

1    the 30th?

2         Q          Today is the 1st.

3         A          Very little.  Oh, very little,

4    then.

5         Q          You have two small children, ages

6    four and two, or something like that?

7         A          Twelve and four.

8         Q          Twelve and four?

9         A          Uh-huh.

10        Q          I take it the four-year-old is the

11   one that you fed the Enfamil to?

12        A          Both of them actually, but in this

13   particular, yes, the four-year-old.

14        Q          Have you spoken with your in-laws

15   about whether they're willing to provide any of their

16   assets to post a bond in this case?

17        A          No.

18        Q          Do you understand that you have

19   the ability to decide for yourself whether to pursue

20   the appeal of the case?

21        A          I would assume so, yes,

22   absolutely.

23        Q          Have you been promised any type of

24   compensation or payment in any form by your brother

25   or other lawyers at this law firm for serving in your

31

1    role as an objector in the case?

2            A          No, absolutely not.

3            Q          Do you understand that if the

4    lawyers prevail in the appeal that you'll get more

5    money?

6            A          More money than?

7            Q          Than what's on the table from the

8    company right now.

9            A          More than $6?  I assume so, but

10   that's, once again, not the issue for me.

11           Q          The issue for you is retribution?

12                      MR. PRICE:  That's not a question.

13           If you want to ask her a question --

14   BY MR. BUNCH:

15           Q          Is the issue for you just making

16   the company pay more?

17           A          Pay more, meaning?

18           Q          Pay more money to settle the case.

19                      MR. PRICE:  She's asked -- asked

20           and answered that question as well.  She's

21           told you why she's objecting.

22                      THE WITNESS:  Yes, I've answered

23           that, so --

24   BY MR. BUNCH:

25           Q          How much more do they need to pay?

32

```
 1        A         I don't -- I think I've answered
 2   that, that it's not that.
 3        Q         What is it that you want to see
 4   happen if your appeal is successful?
 5                  MR. PRICE:  I'm going to object
 6            again, Van.  If you want to ask her about
 7            the bond, ask her about the bond, but we're
 8            getting outside the bond, and either we
 9            stick to it or we stop.
10   BY MR. BUNCH:
11        Q         Are you going to answer the
12   question?
13                  MR. PRICE:  I told you -- no,
14            she's not going to answer the question.  I
15            told you either ask her about the bond or
16            we'll stop, so that's --
17                  MR. BUNCH:  Can you mark this?
18                      (Thereupon, the respective
19                       document was marked
20                       Exhibit No. 3.)
21   BY MR. BUNCH:
22        Q         Mrs. Pack, that's Exhibit 3 to
23   your deposition.  Would you take a minute and just
24   read it to yourself?  And let me know when you're
25   through.
```

33

1                MR. PRICE:  Sandy, don't waste

2     your time.

3                THE WITNESS:  Okay.

4                MR. PRICE:  Van, I told you.  This

5     has nothing to do with the bond, and if you

6     want to ask her questions about the bond ask

7     her or we're done.  That's your choice.

8                MR. BUNCH:  Can I not ask her

9     about Exhibit 3?

10               MR. PRICE:  No, you can't.

11               MR. BUNCH:  You're not going to

12    let her answer questions about it?

13               MR. PRICE:  I'm not.

14               MR. BUNCH:  And what's the basis

15    for that?

16               MR. PRICE:  Because it has nothing

17    to do with the bond, and that's what I told

18    you, was the only questions that you were

19    going to get to ask her today were about the

20    bond.  I told you that before you ever came.

21              MR. BUNCH:  Your response to the

22    motion for the bond says that one of the

23    issues is the merits to the appeal.

24              MR. PRICE:  We told you that the

25    only issues that you would ask her about

34

1      today were the bond, and you're going beyond
2      that.  Van, either you can ask her or we're
3      going to stop.
4                MR. BUNCH:  With all due respect,
5      I think the judge might be interested in
6      knowing whether or not the objector is
7      holding up his settlement is, in the role --
8                MR. PRICE:  Now, Van --
9                MR. BUNCH:  -- as an objector
10     because of some genuine meritorious belief
11     that she had that the settlement is
12     inadequate.
13               MR. PRICE:  You can gesticulate
14     all you want, but we're here to ask her
15     questions about the bond.  You've stopped.
16     You're not asking her questions about the
17     bond, so we're going to stop the deposition.
18               MS. GOTTEHRER:  Why don't we take
19     a break?  We may have additional questions
20     about the bond.
21               MR. PRICE:  No.  We're done.  I
22     told you.
23               MS. GOTTEHRER:  You're not going
24     to let us have additional questions about
25     the bond?

1          MR. PRICE:  I told you we were

2     going to talk about the bond, and you all

3     have chosen to go well beyond that time and

4     time again, so that's --

5          MS. GOTTEHRER:  Well, I'm telling

6     you now that we have additional questions

7     about the bond.  You're telling me you're

8     refusing to let her answer those questions?

9          MR. PRICE:  You had your

10    opportunity to ask her those questions.

11    You've had over --

12          MS. GOTTEHRER:  We've been here

13    for 30 minutes.

14          MR. PRICE:  You've been here for

15    45, and on several occasions I've told you

16    to ask her questions about the bond, and

17    you've chosen to go beyond that, so you've

18    had your chance.

19          MS. GOTTEHRER:  Well, but just to

20    be on the record that we have additional

21    questions specifically about the bond,

22    you're refusing.  We've been here -- you

23    were late, so we started about 15 after, and

24    we have not been here 45 minutes.  Will you

25    give us five minutes to ask more questions,

36

1      or are you going to end this deposition

2      right now?

3                MR. PRICE:  If you want to give me

4      the list of the questions you want to ask.

5                MS. GOTTEHRER:  We're not going to

6      give you a list of questions we may ask.

7                MR. PRICE:  Then we're done.

8                THE VIDEOGRAPHER:  I guess we'll

9      go off the record at this time.

10              FURTHER THE DEPONENT SAITH NOT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STOGSDILL COURT REPORTING SERVICES

37

```
1                    C E R T I F I C A T E

2

3    STATE OF TENNESSEE:

4    COUNTY OF KNOX:

5

6         I, Andrea F. McBee, Court Reporter and Notary

7    Public, do hereby certify that I administered the

8    oath to the deponent, that I reported in machine

9    shorthand the above testimony, that the foregoing

10   pages, numbered 1 to 37, inclusive, were typed under

11   my personal supervision and constitute a true and

12   accurate record of the proceedings, and that there

13   has been no request made by the deponent to review

14   the transcript.

15        I further certify that I am not an attorney

16   or counsel for any of the parties, nor an employee or

17   relative of any attorney or counsel connected with

18   the action, nor financially interested in the action.

19        Witness my hand and official seal this

20   2nd day of March, 2012.

21

22

23        ANDREA F. MCBEE, TN LCR# 116

24        Court Reporter and Notary Public

25        My Commission Expires:  5/09/2012
```

STOGSDILL COURT REPORTING SERVICES