# EXHIBIT A

VIDEOTAPED DEPOSITION OF SANDRA M. PACK

March 1, 2012

UNITED STATES DISTRICT COURT

SOURTHERN DISTRICT OF FLORIDA

MDL NO. 11-MD-0222-COHN/SELTZER

IN RE:   ENFAMIL LIPIL MARKETING      :
         AND SALES PRACTICES          :
         LITIGATION                    :
                                       :
                                       :
------------------------------------ : No. MDL-2222
                                       :
This Document Relates to:              :
                                       :
Nelson v. Mead Johns & Company,        :
LLC                                    :
No. 09-61625-CIV-COHN/SELTZER          :
                                       :
                                       :

APPEARANCES:

              FOR CLASS MEMBER SANDRA M. PACK:

              James H. Price, Esq.
              Lacy, Price & Wagner
              249 North Peters Road, Suite 101
              Knoxville, Tennessee 37923

              FOR THE PLAINTIFFS:

              Van Bunch, Esq.

              Bonnett, Fairbourn, Friedman & Balint

              2901 N. Central Avenue, Suite 1000

              Phoenix, Arizona  85012

Page 2

APPEARANCES: (Continued):
  FOR THE DEFENDANT:
    Gail L. Gottehrer, Esq.
    Axinn, Veltrop, Harkrider
    90 State House Square
    Hartford, Connecticut  06103-3702


ALSO PRESENT:

  Matt Poplin, videographer

STOGSDILL COURT REPORTING SERVICES

Page 3

INDEX
Page No.

Examination,
  By Mr. Bunch ------------------------- 6


EXHIBITS
Exhibit No. 1,
  Subpoena ----------------------------- 21

Exhibit No. 2,
  Statement of objection --------------- 22
Exhibit No. 3,
  10/3/11 document to Tim Blood from
  Allen McDonald ----------------------- 32

STOGSDILL COURT REPORTING SERVICES

Page 4

1          S T I P U L A T I O N
2          The videotaped deposition of SANDRA
3   M. PACK, called as a witness at the instance of the
4   Plaintiffs, pursuant to all applicable rules, taken
5   by agreement on the 1st day of March, 2012, beginning
6   at 4:07 p.m., at the law offices of Lacy, Price &
7   Wagner, 249 North Peters Road, Suite 101, Knoxville,
8   Tennessee, before Andrea F. McBee, Court Reporter and
9   Notary Public, pursuant to the stipulation of
10  counsel.
11          It being agreed that
12  Andrea F. McBee, Court Reporter and Notary Public,
13  may report the deposition in machine shorthand,
14  afterwards reducing the same to typewriting.
15          All objections, except as to the form
16  of the question, are reserved to on or before the
17  hearing.
18          It being further agreed that all
19  formalities as to notice, caption, certificate,
20  transmission, etc., including the reading of the
21  completed deposition by the witness and the signature
22  of the witness, are waived.
23
24
25

Page 5

1          THE VIDEOGRAPHER: Today is March
2   the 1st, 2012. The time on our video
3   monitor is 4:07 p.m. This is the deposition
4   of Sandra Pack, being taken in the Enfamil
5   LIPIL Marketing and Sales Practices
6   Litigation. It relates to Nelson versus
7   Mead Johns & Company, LLC. It's in the
8   United States District Court, Southern
9   District of Florida. My name is Matt
10  Poplin; I'm the videographer. Our court
11  reporter today is Ms. Ann McBee. And the
12  case number is MDL-2222. The attorneys may
13  identify themselves on the record at this
14  time.
15          MR. BUNCH: Van Bunch, Bonnett,
16  Fairbourn, Friedman & Balint, for the
17  plaintiffs.
18          MS. GOTTEHRER: Gail Gottehrer,
19  Axinn, Veltrop and Harkrider, for the
20  defendant.
21          MR. PRICE: Jim Price, Lacy, Price
22  & Wagner for Mrs. Pack.
23
24
25

Page 6

```
 1           SANDRA M. PACK,
 2    called as a witness at the instance of the
 3    Plaintiffs, having been first duly sworn, was
 4    examined and deposed as follows:
 5              EXAMINATION
 6    BY MR. BUNCH:
 7        Q       Good afternoon, Mrs. Pack. Would
 8    you state your name for the record, please?
 9        A       Sandra M. Pack.
10        Q       And your present address?
11        A       2712 Century Drive, Maryville,
12    Tennessee.
13        Q       Have you recently relocated to
14    there?
15        A       Yes.
16        Q       Have you ever sat for a deposition
17    before?
18        A       No.
19        Q       Have you had your lawyer explain
20    to you what a deposition is used for in litigation,
21    or do you want me to do that for you?
22        A       We didn't necessarily talk about
23    it, but I sort of know, but if you want to explain
24    you may.
25        Q       Okay. Well, you know, the court
```

Page 7

```
 1    reporter just swore you in.
 2        A       Yeah.
 3        Q       And even though we're here in a
 4    nice conference room you're, for all intents and
 5    purposes, on a witness stand, and the video camera
 6    over there, for all intents and purposes, is the
 7    judge, the jury, whoever is ending up being the
 8    person who makes the decision in the case, okay?
 9        A       Okay.
10        Q       So your testimony is just as it
11    would be if you're going to go and testify about your
12    objection in this case to a judge, for example. And
13    in order for that testimony to be clear and
14    understandable to the judge and on the record we have
15    a court reporter here who takes it down, and she
16    takes down what I say and then she takes down what
17    you say, and she can't do it if we're talking at the
18    same time. So try to figure out when my question is
19    over and when it is, then you can answer, and then
20    I'll try to do the same for you, okay?
21        A       Absolutely.
22        Q       If you don't understand my
23    question ask me to rephrase it, because when you
24    provide an answer we're going to assume that you
25    understood the question and are answering it to the
```

Page 8

```
 1    best of your knowledge at the time, okay?
 2        A       Okay.
 3        Q       Even though in every day
 4    conversation people use uh-huh and huh-uh and head
 5    nods and shakes to communicate, because we're on a
 6    written record the court reporter needs words, and as
 7    a matter of fact, huh-uh and uh-huh are spelled the
 8    same way, even though they mean two different things.
 9    So you need to use yes and no and not head shakes and
10    such, okay?
11        A       Yes.
12        Q       And I don't think we're going to
13    be here very long or try not to be here very long,
14    especially since you have two little kids that you
15    need to get back to, but if you do need a break at
16    sometime just say so and we'll take a break, other
17    than when a question is pending, okay?
18        A       Yes.
19        Q       That's the one difference between
20    this and being in a witness stand. You don't get to
21    ask the judge for a break in a witness stand. So how
22    long have you lived in Maryville?
23        A       A week.
24        Q       Where do you teach school?
25        A       South Doyle Middle School.
```

Page 9

```
 1        Q       So that's sixth through eighth
 2    grade?
 3        A       Yes.
 4        Q       How long have you worked -- taught
 5    there?
 6        A       Roughly 15 years.
 7        Q       Do you teach Mr. Price's children
 8    or something? How do you know Mr. Price?
 9        A       No. We just met.
10        Q       Today?
11        A       Yes.
12        Q       How is it that you came to be an
13    objector in the Enfamil case?
14            MR. PRICE: I'm going to object to
15        the relevance of the question, but go ahead
16        and answer his question.
17            THE WITNESS: I've seen -- I've
18        seen things about just random cases like
19        that, and this one particularly interested
20        me because it does apply to me.
21    BY MR. BUNCH:
22        Q       And what led to your becoming a
23    participant in the case as an objector?
24        A       Probably the fact that I just --
25    like I said before, it -- this case in particular I
```

Page 10

1   had, I actually had a part of, to me. Does that make
2   sense?
3       Q       Sure. You fed Enfamil to your
4   child.
5       A       Yes.
6       Q       But my question is, how did you
7   learn about the case and then make contact with a
8   lawyer about objecting to the settlement in the case?
9               MR. PRICE: I'm going to object to
10      any questions that relate to any
11      attorney/client privileged information that
12      you may be asking about.
13              MR. BUNCH: Sure.
14  BY MR. BUNCH:
15      Q       I'm not asking you to tell me
16  anything that a lawyer told you in the nature of
17  advice. I'm asking you how it came to be that you
18  retained this law firm to file an objection on your
19  behalf in this case.
20              MR. PRICE: And if you're asking
21      how she found out about us -- let's just cut
22      to the chase. Her brother is one of my
23      lawyers, so that's how she came to know
24      about our firm.
25              THE WITNESS: Yeah.

Page 11

1   BY MR. BUNCH:
2       Q       You had an existing relationship
3   with a lawyer at the firm because he's your brother,
4   right?
5       A       Yes.
6       Q       Did he call you up and tell you
7   about the --
8       A       No.
9       Q       -- Enfamil case? How did it come
10  to be that you decided to file an objection to the
11  firm in the case?
12      A       I actually -- and I can't tell
13  you, to be honest, where I saw it. I've seen stuff
14  randomly on the internet, on TV where you see if
15  you've been a part of this -- I've seen stuff in
16  Parade magazine. I've seen -- various places. Where
17  I actually first heard about this I could not tell
18  you. I do not remember. But I did -- can I
19  continue?
20              MR. PRICE: Uh-huh.
21              THE WITNESS: I just don't want to
22      over answer the question.
23              MR. BUNCH: That's okay.
24              THE WITNESS: But I did contact my
25      brother and ask him if he was familiar with

Page 12

1       any of this, and then I've looked into it,
2       and I have spoken to him about it, so --
3   BY MR. BUNCH:
4       Q       So you -- the -- you heard about
5   the case through the media or otherwise and reached
6   out to your brother, the lawyer at this firm, to
7   discuss the case with him; is that right?
8       A       Yes.
9       Q       What's his name?
10      A       Wallace McDonald.
11      Q       Do you recall when it was that you
12  made the contact with him about the case? The
13  emphasis is on when, not what you said or anything.
14      A       I don't. I'm sorry. I don't.
15      Q       Okay. Have you read any of the
16  papers relating to the case?
17      A       No, only on the internet. I've
18  just looked things up, but I've seen nothing
19  paper-wise.
20      Q       Did you see -- when you say
21  internet, did you look it up on the website that's
22  set up for the settlement of this case?
23      A       I did see that, yes.
24      Q       Did you see that before or after
25  you talked to your brother about what was going on

Page 13

1   with the case?
2       A       I don't recall.
3       Q       It's kind of a chicken and an egg
4   thing, you know, which came first. Did you read
5   about the settlement and then talk to your brother,
6   or had you already talked to your brother and then
7   read about the settlement?
8               MR. PRICE: Object, asked and
9       answered.
10  BY MR. BUNCH:
11      Q       You can answer it.
12      A       I think I just answered and said I
13  don't recall.
14      Q       Is there something that you could
15  use to refresh your recollection to help you get that
16  sense of timing down?
17      A       Probably not, no. I mean, I don't
18  know what I would -- I don't know what I would look
19  at or recall back to to remember that, no.
20      Q       You mentioned Parade magazine; is
21  that what you said?
22      A       I said I've seen things, not
23  necessarily this, because I mean, I, like you, see
24  things every single day, so where I actually saw
25  this, I don't remember if it was -- but I've seen

Page 14

1  them in there, I mean, many different advertisements
2  for different things, if you were involved with this
3  call this, if you've done this do this.
4       Q       Right. But some of those things
5  are solicitations, you know, Attorney James Sokolove,
6  if you've taken some drug, call me up and I'll refer
7  you to somebody that's handling this case for
8  pharmaceuticals. That's one thing. But another
9  thing you see in the media is a notice of a
10  pending -- it's called a notice of pendency of
11  settlement or something like that. Which do you
12  recall seeing, somebody soliciting for you to
13  participate in a case or somebody telling you about a
14  case that was already settled?
15       A       I don't really remember.
16       Q       In your review of the materials on
17  the internet, did you read the notice of the
18  settlement, of the proposed settlement of the class
19  action and learn about your right to object to it?
20       A       One of the things that I saw was,
21  which -- and timeline or which came first, I probably
22  can't say, but I saw an offer for one can of Enfamil,
23  I think, or two, or something like that, and I
24  remember that bothering me.
25       Q       What bothered you about it?

Page 15

1       A       Many things.
2       Q       Okay. I'm here to let you tell us
3  what those are.
4       A       Okay. Well, first of all, I feel
5  that, I guess I would call it your client or your
6  client, I suppose, Enfamil, or whoever makes it --
7            MR. BUNCH: That would be her
8       client.
9            THE WITNESS: Okay. I feel like
10       that as a parent they, I guess I should say,
11       were praying on people who are in a
12       vulnerable state. If I just gave birth to a
13       child and I'm standing there making a
14       decision based on what you have said, your
15       offering, and I make a choice based on what
16       you've said, I -- I was bothered by that,
17       once I find out that that was not true.
18       That's one reason why that bothered me.
19       Secondly, I feel like that at the time I was
20       in a state where I would have made a
21       different decision on purchasing that
22       product had that not been stated the way
23       that it was stated. I also feel that doing
24       what I do for a living -- I see kids every
25       day who are not as fortunate as any of us

Page 16

1       sitting in this room, and when I say that
2       I'm talking about their intelligence level
3       and where they are, and that bothered me,
4       because I feel like that I did what I
5       thought was best for my child based on what
6       you said. So there are -- the top of my
7       list of why I feel that that is wrong.
8  BY MR. BUNCH:
9       Q       Those are many of the same reasons
10  why we as lawyers for purchasers of Enfamil sued Mead
11  Johnson in the first place.
12       A       Okay.
13       Q       And we started off talking about
14  this because you -- you said something that you saw
15  related to your opportunity to get one or two cans of
16  Enfamil. Did something about that bother you?
17       A       Well, yes, I don't need one or two
18  cans of Enfamil, and I just feel like that's not -- I
19  don't think that that -- I don't think that that
20  fixes the problem.
21       Q       Are you saying, then, that the
22  settlement needs to be enriched somehow beyond just
23  the cans of Enfamil? Is that what you understand the
24  settlement to be for?
25       A       I feel it's more about the fact

Page 17

1  that it was a -- I feel like it was more about the
2  fact that it was a blatant lie. I mean, whatever the
3  settlement is is what it is, but I feel like that's a
4  lie, what they did.
5       Q       Right. But do you know what the
6  objections to the settlement filed on your behalf
7  were?
8       A       I believe that I'm objecting to
9  what their offer was.
10       Q       Have you ever read any documents
11  relating to your objection that were filed with the
12  court?
13       A       I have come to them to do those
14  for me.
15       Q       Right. So the question, though,
16  is have you ever read them?
17       A       No.
18       Q       Have you ever seen it?
19       A       No.
20       Q       Then what is your understanding of
21  the objection beyond, if there is one, beyond you
22  don't think that they're doing enough?
23       A       Repeat that.
24       Q       Just tell me what you understand
25  to be the objections that were filed in the federal

Page 18

1  court that's handling this case on your behalf that
2  represent your views about the settlement.
3           MR. PRICE: I'm going to object to
4       the form of the question.
5  BY MR. BUNCH:
6       Q       Do you want me to restate it?
7       A       Yes, because obviously I'm not
8  understanding exactly what you're wanting me to
9  answer.
10      Q       Do you know that this law firm
11 filed a document in federal court on your behalf
12 objecting to the settlement in this case on behalf of
13 Enfamil purchases?
14      A       Yes.
15      Q       You do know that?
16      A       Yes.
17      Q       What do you understand that
18 objection to be?
19      A       That I'm -- my understanding is
20 that I'm disagreeing to what offers have been made.
21      Q       Anything else?
22      A       Not to my knowledge. I mean --
23 and I may -- I mean, I may be not understanding your
24 question.
25      Q       Have you read the document that

Page 19

1  the court authorized to be sent out to purchasers of
2  Enfamil describing the settlement that is proposed in
3  this case? It's called a notice, a class action
4  notice.
5       A       I have not read it. Like I said,
6  that's why I've come to them to do that. I know that
7  -- and I'm going through my head trying to remember
8  anything that we've discussed about this where they
9  have said here's what -- the only thing that I
10 believe that is coming to my head is that there's an
11 offer for something going along, something going to
12 charity, things going to charity maybe, and that's
13 come to my head. Like I said, I'm sitting here
14 trying to remember, because I know that -- that's
15 what's coming to my head.
16      Q       Okay. What is your understanding
17 of your role in the lawsuit?
18          MR. PRICE: I'm going to object to
19      the relevance of the question. When Mr.
20      Wright asked us to get together for a
21      deposition, I made it clear to them that what
22      we were here to do today is to ask her
23      questions related to the efficacy of a bond,
24      and we've gone -- I've let you go on and on
25      about other areas, and we need to get to the

Page 20

1  point and ask her questions related to the
2  bond, or we'll go ahead and stop the
3  deposition. That's what we're here for.
4           MR. BUNCH: Well, as you know -- I
5  mean -- and we don't need to get in too much
6  colloquy about this because it's not even
7  supposed to happen, but in this instance
8  I'll share this with you. Your firm and the
9  plaintiffs' lawyers, or even the joint
10 motion filed for the bond, both relied on
11 the same four factor analysis, one of which
12 is the merits of the appeal, and so I'm
13 entitled to ask her what she understands
14 those merits to be, because if in fact she
15 indicates something that undercuts the
16 merits of your objection, that goes to
17 whether a bond should be imposed.
18          MR. PRICE: I don't think that's
19 correct, Van. And as I told Will when he
20 called me and asked me about this, I told
21 him and sent it to him in writing. If you
22 want to ask her about the efficacy of the
23 bond, that's fine. Otherwise we're going to
24 stop the deposition, so that's totally up to
25 you.

Page 21

1           MR. BUNCH: Well, I'll just
2  continue on and you can do what you think is
3  appropriate. How about that? Let me mark
4  something. Let me mark this first.
5           (Thereupon, the respective
6           document was marked
7           Exhibit No. 1.)
8  BY MR. BUNCH:
9       Q       Mrs. Pack, this has been marked as
10 Exhibit 1 to your deposition. Have you ever seen
11 that document before?
12      A       I don't believe so.
13      Q       That's a subpoena that your
14 brother's law firm or your law firm agree to accept
15 on your behalf for you to show up here today to sit
16 for your deposition. That's a court document.
17          MR. PRICE: She just said she
18      didn't see it.
19          MR. BUNCH: I'm just telling her
20      what it is.
21 BY MR. BUNCH:
22      Q       Did you bring any papers with you
23 today?
24      A       No.
25          MR. BUNCH: Can you mark that,

Page 22

1   please?
2          (Thereupon, the respective
3          document was marked
4          Exhibit No. 2.)
5          MR. BUNCH:  This is the objection.
6          MR. PRICE:  And as she said, she's
7   not read the objection.
8   BY MR. BUNCH:
9       Q      Mrs. Pack, that's Exhibit 2 to
10  your deposition.  Have you ever seen that document
11  before?
12      A      No.
13      Q      Would you turn to the very last
14  page of the exhibit?
15      A      All right.
16      Q      Is that your signature?
17      A      Yes.
18      Q      Do you see what it says under
19  "signature of class member/objector?"  Did you read
20  that before you signed it?
21      A      Yes.
22      Q      Had you read the instructions for
23  filing objections that are referenced in that
24  statement above your signature?
25      A      Did I read that?

Page 23

1       Q      Have you read something called
2   instructions for filing objections, as stated in that
3   language above your signature?  It reads, "Pursuant
4   to the instruction for filing objections In Re:
5   Enfamil LIPIL Marketing and Sales Practices
6   Litigation."  Have you ever read anything that are
7   called instructions for filing objections?
8       A      No.
9       Q      The next to the last page of that
10  Exhibit 2 is a claim form.  Is that your signature in
11  the lower left-hand corner?
12      A      Yes.
13      Q      Is this your handwriting on this
14  document?
15      A      I signed the bottom.
16      Q      Did you read it before you signed
17  it?
18      A      Yes.
19      Q      It says in item D, "Which of the
20  following settlement benefits do you want to
21  receive?"  And you checked -- or it is checked cash.
22      A      Yes.
23      Q      Is that the settlement benefit you
24  want to receive?
25      A      I have no need for Enfamil, so --

Page 24

1       Q      Okay.  And how much cash do you
2   think you're going to get?
3       A      I'm not -- it's not about that at
4   all.
5       Q      What's it about?
6       A      I answered your question earlier,
7   I think.
8       Q      Do you know how much cash is
9   proposed to be paid to all the purchasers of Enfamil?
10      A      No.
11      Q      Is there an amount of compensation
12  made through payment of money that you think is
13  sufficient to address your concern about the
14  information, the wrong information you received by
15  Enfamil?
16          MR. PRICE:  We're going to stop
17      the deposition right now.  Van, I told you
18      that we were here to talk about the bond.
19      And I was nice about it and I'm continuing
20      to be nice about it, but you are continuing
21      to go beyond the issue of the bond.  You had
22      an opportunity to make a record at the trial
23      level and you didn't do that, so unless you
24      are going to ask questions specifically
25      about the bond, we're going to stop the

Page 25

1   deposition now.
2   BY MR. BUNCH:
3       Q      Well, let me ask you some
4   questions about the bond, then.  Do you know what a
5   bond is?
6       A      I believe it was explained to me.
7       Q      And you understand -- you're
8   comfortable with the explanation that was given to
9   you?
10      A      I believe so.
11      Q      Okay.  Do you have an agreement in
12  writing with this law firm that states the terms and
13  conditions of their representing you in the case?
14      A      No, I have signed nothing with
15  them, no contract.
16      Q      Do you have an expectation that
17  you're going to pay attorneys' fees to them for
18  representing you in connection with your objection?
19          MR. PRICE:  And I'm going to
20      object to any agreement that we have with
21      our client.
22          MR. BUNCH:  On what basis?
23          MR. PRICE:  That's attorney/client
24      privilege.  That's not any of your business,
25      what our agreement is with her.

Page 26

```
1          MR. BUNCH:  Well, if she's not --
2    if you haven't complied with the
3    technicalities of engaging an
4    attorney/client relationship with your
5    client, then you don't have one.
6          MR. PRICE:  That's not true.  We
7    have a relationship with her, and we're not
8    disclosing what our relationship is with her
9    to you.  It's not any of your business.
10   BY MR. BUNCH:
11     Q     Is it your understanding that if
12   the judge imposes a requirement that you post a bond
13   in order to maintain your appeal in this case, that
14   you are going to be responsible for posting that
15   bond?
16     A     If I'm understanding you, then I
17   believe my answer is yes.
18     Q     Do you know how much the bond is,
19   in terms of how much the parties in the case are
20   suggesting to the judge, that you have to put up?
21     A     I believe so.
22     Q     What number is that?
23     A     I believe that they asked me if I
24   had $70,000; is that correct?
25     Q     I'm just asking you what your
```

Page 27

```
1    understanding --
2      A     That's my understanding.
3      Q     Something like $70,000?
4      A     Some absurd number, yes.
5      Q     Have you looked into whether you
6    could provide a bond of that character?
7      A     Yes.
8      Q     And could you?
9      A     Absolutely not.
10     Q     Have you talked to bonding
11   companies?
12     A     No.
13     Q     Do you think you have to put up
14   $70,000 in cash in order to meet the requirements of
15   posting a bond?
16     A     I would assume on -- I'm going to
17   -- I don't know.  I'll say I don't know.
18     Q     Have your lawyers agreed to put it
19   up for you?
20     A     No.
21     Q     Have you consulted with a
22   financial advisor in coming to the conclusion that
23   you don't have sufficient assets to post a $70,000
24   bond?
25     A     No.
```

Page 28

```
1      Q     Did you just buy a new house?
2      A     No.
3      Q     Are you buying the house that you
4    live in?
5      A     No.
6      Q     You're renting?
7      A     No.
8      Q     You're living with your parents?
9      A     In-laws.
10     Q     Okay.  What assets do you have
11   available to put up to secure a bond?
12           MR. PRICE:  And that's assuming
13     that you have any.  That's a question that
14     assumes that you have some.
15           THE WITNESS:  By assets, do you
16     mean what do I own?
17           MR. BUNCH:  Sure.
18           THE WITNESS:  I own nothing in my
19     outright.
20   BY MR. BUNCH:
21     Q     You and your husband own property
22   together as marital property?
23     A     No.
24     Q     You don't own a house or a car?
25     A     I make payments on a car.  I
```

Page 29

```
1    assume I don't own it.
2      Q     So your only source of income is
3    your salary as a teacher at Doyle Middle School?
4      A     South Doyle Middle School, yes.
5      Q     South Doyle.  Is there a North
6    Doyle?
7      A     No.
8      Q     Is there an east or west?
9      A     No.
10     Q     Okay.  But that's your only source
11   of income?
12     A     Yes.
13     Q     Has your -- is your husband behind
14   your effort in the case to the extent that he's
15   willing to provide whatever assets he has to secure a
16   bond?
17           MR. PRICE:  And again, that
18     assumes he has any.
19           THE WITNESS:  I was wondering what
20     you're talking about, because we own
21     nothing, either one of us.  He pays on his
22     car just like I do.
23   BY MR. BUNCH:
24     Q     You have no cash in the bank?
25     A     Let me look at the date.  Today is
```

Page 30

1  the 30th?
2      Q      Today is the 1st.
3      A      Very little.  Oh, very little,
4  then.
5      Q      You have two small children, ages
6  four and two, or something like that?
7      A      Twelve and four.
8      Q      Twelve and four?
9      A      Uh-huh.
10     Q      I take it the four-year-old is the
11  one that you fed the Enfamil to?
12     A      Both of them actually, but in this
13  particular, yes, the four-year-old.
14     Q      Have you spoken with your in-laws
15  about whether they're willing to provide any of their
16  assets to post a bond in this case?
17     A      No.
18     Q      Do you understand that you have
19  the ability to decide for yourself whether to pursue
20  the appeal of the case?
21     A      I would assume so, yes,
22  absolutely.
23     Q      Have you been promised any type of
24  compensation or payment in any form by your brother
25  or other lawyers at this law firm for serving in your

Page 31

1  role as an objector in the case?
2      A      No, absolutely not.
3      Q      Do you understand that if the
4  lawyers prevail in the appeal that you'll get more
5  money?
6      A      More money than?
7      Q      Than what's on the table from the
8  company right now.
9      A      More than $6?  I assume so, but
10  that's, once again, not the issue for me.
11     Q      The issue for you is retribution?
12          MR. PRICE:  That's not a question.
13     If you want to ask her a question --
14  BY MR. BUNCH:
15     Q      Is the issue for you just making
16  the company pay more?
17     A      Pay more, meaning?
18     Q      Pay more money to settle the case.
19          MR. PRICE:  She's asked -- asked
20     and answered that question as well.  She's
21     told you why she's objecting.
22          THE WITNESS:  Yes, I've answered
23     that, so --
24  BY MR. BUNCH:
25     Q      How much more do they need to pay?

Page 32

1      A      I don't -- I think I've answered
2  that, that it's not that.
3      Q      What is it that you want to see
4  happen if your appeal is successful?
5          MR. PRICE:  I'm going to object
6     again, Van.  If you want to ask her about
7     the bond, ask her about the bond, but we're
8     getting outside the bond, and either we
9     stick to it or we stop.
10  BY MR. BUNCH:
11     Q      Are you going to answer the
12  question?
13          MR. PRICE:  I told you -- no,
14     she's not going to answer the question.  I
15     told you either ask her about the bond or
16     we'll stop, so that's --
17          MR. BUNCH:  Can you mark this?
18          (Thereupon, the respective
19          document was marked
20          Exhibit No. 3.)
21  BY MR. BUNCH:
22     Q      Mrs. Pack, that's Exhibit 3 to
23  your deposition.  Would you take a minute and just
24  read it to yourself?  And let me know when you're
25  through.

Page 33

1          MR. PRICE:  Sandy, don't waste
2     your time.
3          THE WITNESS:  Okay.
4          MR. PRICE:  Van, I told you.  This
5     has nothing to do with the bond, and if you
6     want to ask her questions about the bond ask
7     her or we're done.  That's your choice.
8          MR. BUNCH:  Can I not ask her
9     about Exhibit 3?
10          MR. PRICE:  No, you can't.
11          MR. BUNCH:  You're not going to
12     let her answer questions about it?
13          MR. PRICE:  I'm not.
14          MR. BUNCH:  And what's the basis
15     for that?
16          MR. PRICE:  Because it has nothing
17     to do with the bond, and that's what I told
18     you, was the only questions that you were
19     going to get to ask her today were about the
20     bond.  I told you that before you ever came.
21          MR. BUNCH:  Your response to the
22     motion for the bond says that one of the
23     issues is the merits to the appeal.
24          MR. PRICE:  We told you that the
25     only issues that you would ask her about

Page 34

1  today were the bond, and you're going beyond
2  that. Van, either you can ask her or we're
3  going to stop.
4      MR. BUNCH: With all due respect,
5  I think the judge might be interested in
6  knowing whether or not the objector is
7  holding up his settlement is, in the role --
8      MR. PRICE: Now, Van --
9      MR. BUNCH: -- as an objector
10 because of some genuine meritorious belief
11 that she had that the settlement is
12 inadequate.
13     MR. PRICE: You can gesticulate
14 all you want, but we're here to ask her
15 questions about the bond. You've stopped.
16 You're not asking her questions about the
17 bond, so we're going to stop the deposition.
18     MS. GOTTEHRER: Why don't we take
19 a break? We may have additional questions
20 about the bond.
21     MR. PRICE: No. We're done. I
22 told you.
23     MS. GOTTEHRER: You're not going
24 to let us have additional questions about
25 the bond?

Page 35

1      MR. PRICE: I told you we were
2  going to talk about the bond, and you all
3  have chosen to go well beyond that time and
4  time again, so that's --
5      MS. GOTTEHRER: Well, I'm telling
6  you now that we have additional questions
7  about the bond. You're telling me you're
8  refusing to let her answer those questions?
9      MR. PRICE: You had your
10 opportunity to ask her those questions.
11 You've had over --
12     MS. GOTTEHRER: We've been here
13 for 30 minutes.
14     MR. PRICE: You've been here for
15 45, and on several occasions I've told you
16 to ask her questions about the bond, and
17 you've chosen to go beyond that, so you've
18 had your chance.
19     MS. GOTTEHRER: Well, but just to
20 be on the record that we have additional
21 questions specifically about the bond,
22 you're refusing. We've been here -- you
23 were late, so we started about 15 after, and
24 we have not been here 45 minutes. Will you
25 give us five minutes to ask more questions,

Page 36

1  or are you going to end this deposition
2  right now?
3      MR. PRICE: If you want to give me
4  the list of the questions you want to ask.
5      MS. GOTTEHRER: We're not going to
6  give you a list of questions we may ask.
7      MR. PRICE: Then we're done.
8      THE VIDEOGRAPHER: I guess we'll
9  go off the record at this time.
10     FURTHER THE DEPONENT SAITH NOT
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 37

1      C E R T I F I C A T E
2
3  STATE OF TENNESSEE:
4  COUNTY OF KNOX:
5
6      I, Andrea F. McBee, Court Reporter and Notary
7  Public, do hereby certify that I administered the
8  oath to the deponent, that I reported in machine
9  shorthand the above testimony, that the foregoing
10 pages, numbered 1 to 37, inclusive, were typed under
11 my personal supervision and constitute a true and
12 accurate record of the proceedings, and that there
13 has been no request made by the deponent to review
14 the transcript.
15     I further certify that I am not an attorney
16 or counsel for any of the parties, nor an employee or
17 relative of any attorney or counsel connected with
18 the action, nor financially interested in the action.
19     Witness my hand and official seal this
20 2nd day of March, 2012.
21
22
23     ANDREA F. MCBEE, TN LCR# 116
24     Court Reporter and Notary Public
25     My Commission Expires: 5/09/2012

**A**

ability 30:19
absolutely 7:21
  27:9 30:22 31:2
absurd 27:4
accept 21:14
accurate 37:12
action 14:19 19:3
  37:18,18
additional 34:19
  34:24 35:6,20
address 6:10 24:13
administered 37:7
advertisements
  14:1
advice 10:17
advisor 27:22
afternoon 6:7
ages 30:5
agree 21:14
agreed 4:11,18
  27:18
agreement 4:5
  25:11,20,25
ahead 9:15 20:2
Allen 3:11
amount 24:11
analysis 20:11
Andrea 4:8,12
  37:6,23
Ann 5:11
answer 7:19,24
  9:16 11:22 13:11
  18:9 26:17 32:11
  32:14 33:12 35:8
answered 13:9,12
  24:6 31:20,22
  32:1
answering 7:25
appeal 20:12 26:13
  30:20 31:4 32:4
  33:23
APPEARANCES
  1:16 2:1
applicable 4:4
apply 9:20
appropriate 21:3
areas 19:25
Arizona 1:25

asked 13:8 19:20
  20:20 26:23
  31:19,19
asking 10:12,15,17
  10:20 26:25
  34:16
assets 27:23 28:10
  28:15 29:15
  30:16
assume 7:24 27:16
  29:1 30:21 31:9
assumes 28:14
  29:18
assuming 28:12
attorney 14:5
  37:15,17
attorneys 5:12
  25:17
attorney/client
  10:11 25:23 26:4
authorized 19:1
available 28:11
Avenue 1:24
Axinn 2:3 5:19

**B**

B 3:6
back 8:15 13:19
Balint 1:23 5:16
bank 29:24
based 15:14,15
  16:5
basis 25:22 33:14
becoming 9:22
beginning 4:5
behalf 10:19 17:6
  18:1,11,12 21:15
belief 34:10
believe 17:8 19:10
  21:12 25:6,10
  26:17,21,23
benefit 23:23
benefits 23:20
best 8:1 16:5
beyond 16:22
  17:21,21 24:21
  34:1 35:3,17
birth 15:12
blatant 17:2

**Blood** 3:10
bond 19:23 20:2
  20:10,17,23
  24:18,21,25 25:4
  25:5 26:12,15,18
  27:6,15,24 28:11
  29:16 30:16 32:7
  32:7,8,15 33:5,6
  33:17,20,22 34:1
  34:15,17,20,25
  35:2,7,16,21
bonding 27:10
Bonnett 1:23 5:15
bother 16:16
bothered 14:25
  15:16,18 16:3
bothering 14:24
bottom 23:15
break 8:15,16,21
  34:19
bring 21:22
brother 10:22 11:3
  11:25 12:6,25
  13:5,6 30:24
brother's 21:14
Bunch 1:22 3:3
  5:15,15 6:6 9:21
  10:13,14 11:1,23
  12:3 13:10 15:7
  16:8 18:5 20:4
  21:1,8,19,21,25
  22:5,8 25:2,22
  26:1,10 28:17,20
  29:23 31:14,24
  32:10,17,21 33:8
  33:11,14,21 34:4
  34:9
business 25:24
  26:9
buy 28:1
buying 28:3

**C**

C 37:1,1
call 11:6 14:3,6
  15:5
called 4:3 6:2
  14:10 19:3 20:20
  23:1,7

camera 7:5
cans 16:15,18,23
caption 4:19
car 28:24,25 29:22
case 5:12 7:8,12
  9:13,23,25 10:7,8
  10:19 11:9,11
  12:5,7,12,16,22
  13:1 14:7,13,14
  18:1,12 19:3
  25:13 26:13,19
  29:14 30:16,20
  31:1,18
cases 9:18
cash 23:21 24:1,8
  27:14 29:24
Central 1:24
Century 6:11
certificate 4:19
certify 37:7,15
chance 35:18
character 27:6
charity 19:12,12
chase 10:22
checked 23:21,21
chicken 13:3
child 10:4 15:13
  16:5
children 9:7 30:5
choice 15:15 33:7
chosen 35:3,17
claim 23:10
class 1:17 14:18
  19:3 22:19
clear 7:13 19:21
client 15:5,6,8
  25:21 26:5
colloquy 20:6
come 11:9 17:13
  19:6,13
comfortable 25:8
coming 19:10,15
  27:22
Commission 37:25
communicate 8:5
companies 27:11
company 1:12 5:7
  31:8,16
compensation

24:11 30:24
completed 4:21
complied 26:2
concern 24:13
conclusion 27:22
conditions 25:13
conference 7:4
connected 37:17
Connecticut 2:4
connection 25:18
constitute 37:11
consulted 27:21
contact 10:7 11:24
  12:12
continue 11:19
  21:2
Continued 2:1
continuing 24:19
  24:20
contract 25:15
conversation 8:4
corner 23:11
correct 20:19
  26:24
counsel 4:10 37:16
  37:17
COUNTY 37:4
court 1:4 2:25 3:25
  4:8,12 5:8,10
  6:25 7:15 8:6
  17:12 18:1,11
  19:1 21:16 37:6
  37:24
cut 10:21

**D**

D 3:1 23:19
date 29:25
day 4:5 8:3 13:24
  15:25 37:20
decide 30:19
decided 11:10
decision 7:8 15:14
  15:21
defendant 2:2 5:20
deponent 36:10
  37:8,13
deposed 6:4
deposition 1:1 4:2

4:13,21 5:3 6:16
6:20 19:21 20:3
20:24 21:10,16
22:10 24:17 25:1
32:23 34:17 36:1
**describing** 19:2
**difference** 8:19
**different** 8:8 14:1
14:2 15:21
**disagreeing** 18:20
**disclosing** 26:8
**discuss** 12:7
**discussed** 19:8
**District** 1:4,5 5:8,9
**document** 1:11
3:10 18:11,25
21:6,11,16 22:3
22:10 23:14
32:19
**documents** 17:10
**doing** 15:23 17:22
**Doyle** 8:25 29:3,4
29:5,6
**Drive** 6:11
**drug** 14:6
**due** 34:4
**duly** 6:3

**E**
**E** 3:1,6 37:1,1
**earlier** 24:6
**east** 29:8
**efficacy** 19:23
20:22
**effort** 29:14
**egg** 13:3
**eighth** 9:1
**either** 29:21 32:8
32:15 34:2
**emphasis** 12:13
**employee** 37:16
**Enfamil** 1:8 5:4
9:13 10:3 11:9
14:22 15:6 16:10
16:16,18,23
18:13 19:2 23:5
23:25 24:9,15
30:11
**engaging** 26:3

**enriched** 16:22
**entitled** 20:13
**especially** 8:14
**Esq** 1:18,22 2:3
**exactly** 18:8
**Examination** 3:2
6:5
**examined** 6:4
**example** 7:12
**exhibit** 3:7,8,10
21:7,10 22:4,9,14
23:10 32:20,22
33:9
**existing** 11:2
**expectation** 25:16
**Expires** 37:25
**explain** 6:19,23
**explained** 25:6
**explanation** 25:8
**extent** 29:14

**F**
**F** 4:8,12 37:1,6,23
**fact** 8:7 9:24 16:25
17:2 20:14
**factor** 20:11
**Fairbourn** 1:23
5:16
**familiar** 11:25
**fed** 10:3 30:11
**federal** 17:25
18:11
**feel** 15:4,9,19,23
16:4,7,18,25 17:1
17:3
**fees** 25:17
**figure** 7:18
**file** 10:18 11:10
**filed** 17:6,11,25
18:11 20:10
**filing** 22:23 23:2,4
23:7
**financial** 27:22
**financially** 37:18
**find** 15:17
**fine** 20:23
**firm** 10:18,24 11:3
11:11 12:6 18:10
20:8 21:14,14

25:12 30:25
**first** 6:3 11:17 13:4
14:21 15:4 16:11
21:4
**five** 35:25
**fixes** 16:20
**Florida** 1:5 5:9
**following** 23:20
**follows** 6:4
**foregoing** 37:9
**form** 4:15 18:4
23:10 30:24
**formalities** 4:19
**fortunate** 15:25
**found** 10:21
**four** 20:11 30:6,7,8
**four-year-old**
30:10,13
**Friedman** 1:23
5:16
**further** 4:18 36:10
37:15

**G**
**Gail** 2:3 5:18
**genuine** 34:10
**gesticulate** 34:13
**getting** 32:8
**give** 35:25 36:3,6
**given** 25:8
**go** 7:11 9:15 19:24
20:2 24:21 35:3
35:17 36:9
**goes** 20:16
**going** 7:11,24 8:12
9:14 10:9 12:25
18:3 19:7,11,12
19:18 20:23 24:2
24:16,24,25
25:17,19 26:14
27:16 32:5,11,14
33:11,19 34:1,3
34:17,23 35:2
36:1,5
**Good** 6:7
**Gottehrer** 2:3 5:18
5:18 34:18,23
35:5,12,19 36:5
**grade** 9:2

**guess** 15:5,10 36:8

**H**
**H** 1:18 3:6
**hand** 37:19
**handling** 14:7 18:1
**handwriting** 23:13
**happen** 20:7 32:4
**Harkrider** 2:3
5:19
**Hartford** 2:4
**head** 8:4,9 19:7,10
19:13,15
**heard** 11:17 12:4
**hearing** 4:17
**help** 13:15
**holding** 34:7
**honest** 11:13
**house** 2:4 28:1,3
28:24
**huh-uh** 8:4,7
**husband** 28:21
29:13

**I**
**identify** 5:13
**imposed** 20:17
**imposes** 26:12
**inadequate** 34:12
**including** 4:20
**inclusive** 37:10
**income** 29:2,11
**indicates** 20:15
**information** 10:11
24:14,14
**instance** 4:3 6:2
20:7
**instruction** 23:4
**instructions** 22:22
23:2,7
**intelligence** 16:2
**intents** 7:4,6
**interested** 9:19
34:5 37:18
**internet** 11:14
12:17,21 14:17
**involved** 14:2
**in-laws** 28:9 30:14
**issue** 24:21 31:10

31:11,15
**issues** 33:23,25
**item** 23:19

**J**
**James** 1:18 14:5
**Jim** 5:21
**Johns** 1:12 5:7
**Johnson** 16:11
**joint** 20:9
**judge** 7:7,12,14
8:21 26:12,20
34:5
**jury** 7:7

**K**
**kids** 8:14 15:24
**kind** 13:3
**know** 6:23,25 9:8
10:23 13:4,18,18
14:5 17:5 18:10
18:15 19:6,14
20:4 24:8 25:4
26:18 27:17,17
32:24
**knowing** 34:6
**knowledge** 8:1
18:22
**KNOX** 37:4
**Knoxville** 1:19 4:7

**L**
**L** 2:3 4:1
**Lacy** 1:18 4:6 5:21
**language** 23:3
**late** 35:23
**law** 4:6 10:18
18:10 21:14,14
25:12 30:25
**lawsuit** 19:17
**lawyer** 6:19 10:8
10:16 11:3 12:6
**lawyers** 10:23
16:10 20:9 27:18
30:25 31:4
**LCR** 37:23
**learn** 10:7 14:19
**led** 9:22
**left-hand** 23:11

**let's** 10:21
**level** 16:2 24:23
**lie** 17:2,4
**LIPIL** 1:8 5:5 23:5
**list** 16:7 36:4,6
**litigation** 1:9 5:6
  6:20 23:6
**little** 8:14 30:3,3
**live** 28:4
**lived** 8:22
**living** 15:24 28:8
**LLC** 1:13 5:7
**long** 8:13,13,22 9:4
**look** 12:21 13:18
  29:25
**looked** 12:1,18
  27:5
**lower** 23:11

**M**

**M** 1:1,17 4:3 6:1,9
**machine** 4:13 37:8
**magazine** 11:16
  13:20
**maintain** 26:13
**making** 15:13
  31:15
**March** 1:2 4:5 5:1
  37:20
**marital** 28:22
**mark** 21:3,4,25
  32:17
**marked** 21:6,9
  22:3 32:19
**Marketing** 1:8 5:5
  23:5
**Maryville** 6:11
  8:22
**materials** 14:16
**Matt** 2:7 5:9
**matter** 8:7
**McBee** 4:8,12 5:11
  37:6,23
**McDonald** 3:11
  12:10
**MDL** 1:6
**MDL-2222** 1:10
  5:12
**Mead** 1:12 5:7

16:10
**mean** 8:8 13:17,23
  14:1 17:2 18:22
  18:23 20:5 28:16
**meaning** 31:17
**media** 12:5 14:9
**meet** 27:14
**MEMBER** 1:17
**member/objector**
  22:19
**mentioned** 13:20
**meritorious** 34:10
**merits** 20:12,14,16
  33:23
**met** 9:9
**Middle** 8:25 29:3,4
**minute** 32:23
**minutes** 35:13,24
  35:25
**money** 24:12 31:5
  31:6,18
**monitor** 5:3
**motion** 20:10
  33:22

**N**

**N** 1:24 3:1 4:1
**name** 5:9 6:8 12:9
**nature** 10:16
**necessarily** 6:22
  13:23
**need** 8:9,15,15
  16:17 19:25 20:5
  23:25 31:25
**needs** 8:6 16:22
**Nelson** 1:12 5:6
**new** 28:1
**nice** 7:4 24:19,20
**nods** 8:5
**North** 1:19 4:7
  29:5
**Notary** 4:9,12 37:6
  37:24
**notice** 4:19 14:9,10
  14:17 19:3,4
**number** 5:12 26:22
  27:4
**numbered** 37:10

**O**

**O** 4:1
**oath** 37:8
**object** 9:14 10:9
  13:8 14:19 18:3
  19:18 25:20 32:5
**objecting** 10:8
  17:8 18:12 31:21
**objection** 3:9 7:12
  10:18 11:10
  17:11,21 18:18
  20:16 22:5,7
  25:18
**objections** 4:15
  17:6,25 22:23
  23:2,4,7
**objector** 9:13,23
  31:1 34:6,9
**obviously** 18:7
**occasions** 35:15
**offer** 14:22 17:9
  19:11
**offering** 15:15
**offers** 18:20
**offices** 4:6
**official** 37:19
**Oh** 30:3
**okay** 6:25 7:8,9,20
  8:1,2,10,17 11:23
  12:15 15:2,4,9
  16:12 19:16 24:1
  25:11 28:10
  29:10 33:3
**once** 15:17 31:10
**opportunity** 16:15
  24:22 35:10
**order** 7:13 26:13
  27:14
**outright** 28:19
**outside** 32:8

**P**

**P** 4:1
**Pack** 1:1,17 4:3 5:4
  5:22 6:1,7,9 21:9
  22:9 32:22
**page** 3:1 22:14
  23:9
**pages** 37:10

**paid** 24:9
**papers** 12:16 21:22
**paper-wise** 12:19
**Parade** 11:16
  13:20
**parent** 15:10
**parents** 28:8
**part** 10:1 11:15
**participant** 9:23
**participate** 14:13
**particular** 9:25
  30:13
**particularly** 9:19
**parties** 26:19
  37:16
**pay** 25:17 31:16,17
  31:18,25
**payment** 24:12
  30:24
**payments** 28:25
**pays** 29:21
**pendency** 14:10
**pending** 8:17
  14:10
**people** 8:4 15:11
**person** 7:8
**personal** 37:11
**Peters** 1:19 4:7
**pharmaceuticals**
  14:8
**Phoenix** 1:25
**place** 16:11
**places** 11:16
**plaintiffs** 1:20 4:4
  5:17 6:3 20:9
**please** 6:8 22:1
**point** 20:1
**Poplin** 2:7 5:10
**post** 26:12 27:23
  30:16
**posting** 26:14
  27:15
**Practices** 1:8 5:5
  23:5
**praying** 15:11
**present** 2:6 6:10
**prevail** 31:4
**Price** 1:18,18 4:6
  5:21,21,21 9:8,14

10:9,20 11:20
  13:8 18:3 19:18
  20:18 21:17 22:6
  24:16 25:19,23
  26:6 28:12 29:17
  31:12,19 32:5,13
  33:1,4,10,13,16
  33:24 34:8,13,21
  35:1,9,14 36:3,7
**Price's** 9:7
**privilege** 25:24
**privileged** 10:11
**probably** 9:24
  13:17 14:21
**problem** 16:20
**proceedings** 37:12
**product** 15:22
**promised** 30:23
**property** 28:21,22
**proposed** 14:18
  19:2 24:9
**provide** 7:24 27:6
  29:15 30:15
**Public** 4:9,12 37:7
  37:24
**purchasers** 16:10
  19:1 24:9
**purchases** 18:13
**purchasing** 15:21
**purposes** 7:5,6
**pursuant** 4:4,9
  23:3
**pursue** 30:19
**put** 26:20 27:13,18
  28:11
**p.m** 4:6 5:3

**Q**

**question** 4:16 7:18
  7:23,25 8:17 9:15
  9:16 10:6 11:22
  17:15 18:4,24
  19:19 24:6 28:13
  31:12,13,20
  32:12,14
**questions** 10:10
  19:23 20:1 24:24
  25:4 33:6,12,18
  34:15,16,19,24

35:6,8,10,16,21
35:25 36:4,6

**R**
R 37:1
random 9:18
randomly 11:14
reached 12:5
read 12:15 13:4,7
  14:17 17:10,16
  18:25 19:5 22:7
  22:19,22,25 23:1
  23:6,16 32:24
reading 4:20
reads 23:3
really 14:15
reason 15:18
reasons 16:9
recall 12:11 13:2
  13:13,19 14:12
receive 23:21,24
received 24:14
recollection 13:15
record 5:13 6:8
  7:14 8:6 24:22
  35:20 36:9 37:12
reducing 4:14
refer 14:6
referenced 22:23
refresh 13:15
refusing 35:8,22
relate 10:10
related 16:15
  19:23 20:1
relates 1:11 5:6
relating 12:16
  17:11
relationship 11:2
  26:4,7,8
relative 37:17
relevance 9:15
  19:19
relied 20:10
relocated 6:13
remember 11:18
  13:19,25 14:15
  14:24 19:7,14
renting 28:6
Repeat 17:23

rephrase 7:23
report 4:13
reported 37:8
reporter 4:8,12
  5:11 7:1,15 8:6
  37:6,24
REPORTING
  2:25 3:25
represent 18:2
representing 25:13
  25:18
request 37:13
requirement 26:12
requirements
  27:14
reserved 4:16
respect 34:4
respective 21:5
  22:2 32:18
response 33:21
responsible 26:14
restate 18:6
retained 10:18
retribution 31:11
review 14:16 37:13
right 11:4 12:7
  14:4,19 17:5,15
  22:15 24:17 31:8
  36:2
Road 1:19 4:7
role 19:17 31:1
  34:7
room 7:4 16:1
Roughly 9:6
rules 4:4

**S**
S 3:6 4:1
SAITH 36:10
salary 29:3
Sales 1:8 5:5 23:5
Sandra 1:1,17 4:2
  5:4 6:1,9
Sandy 33:1
sat 6:16
saw 11:13 13:24
  14:20,22 16:14
saying 16:21
says 22:18 23:19

33:22
school 8:24,25 29:3
  29:4
seal 37:19
Secondly 15:19
secure 28:11 29:15
see 11:14 12:20,23
  12:24 13:23 14:9
  15:24 21:18
  22:18 32:3
seeing 14:12
seen 9:17,18 11:13
  11:15,16 12:18
  13:22,25 17:18
  21:10 22:10
sense 10:2 13:16
sent 19:1 20:21
SERVICES 2:25
  3:25
serving 30:25
set 12:22
settle 31:18
settled 14:14
settlement 10:8
  12:22 13:5,7
  14:11,18,18
  16:22,24 17:3,6
  18:2,12 19:2
  23:20,23 34:7,11
shakes 8:5,9
share 20:8
shorthand 4:13
  37:9
show 21:15
signature 4:21
  22:16,19,24 23:3
  23:10
signed 22:20 23:15
  23:16 25:14
single 13:24
sit 21:15
sitting 16:1 19:13
sixth 9:1
small 30:5
Sokolove 14:5
solicitations 14:5
soliciting 14:12
somebody 14:7,12
  14:13

sorry 12:14
sort 6:23
source 29:2,10
SOURTHERN 1:5
South 8:25 29:4,5
Southern 5:8
specifically 24:24
  35:21
spelled 8:7
spoken 12:2 30:14
Square 2:4
stand 7:5 8:20,21
standing 15:13
started 16:13
  35:23
state 2:4 6:8 15:12
  15:20 37:3
stated 15:22,23
  23:2
statement 3:9
  22:24
states 1:4 5:8 25:12
stick 32:9
stipulation 4:9
STOGSDILL 2:25
  3:25
stop 20:2,24 24:16
  24:25 32:9,16
  34:3,17
stopped 34:15
stuff 11:13,15
subpoena 3:7
  21:13
successful 32:4
sued 16:10
sufficient 24:13
  27:23
suggesting 26:20
Suite 1:19,24 4:7
supervision 37:11
suppose 15:6
supposed 20:7
Sure 10:3,13 28:17
swore 7:1
sworn 6:3

**T**
T 3:6 4:1,1 37:1,1
table 31:7

take 8:16 30:10
  32:23 34:18
taken 4:4 5:4 14:6
takes 7:15,16,16
talk 6:22 13:5
  24:18 35:2
talked 12:25 13:6
  27:10
talking 7:17 16:2
  16:13 29:20
taught 9:4
teach 8:24 9:7
teacher 29:3
technicalities 26:3
tell 10:15 11:6,12
  11:17 15:2 17:24
telling 14:13 21:19
  35:5,7
Tennessee 1:19 4:8
  6:12 37:3
terms 25:12 26:19
testify 7:11
testimony 7:10,13
  37:9
thing 13:4 14:8,9
  19:9
things 8:8 9:18
  12:18 13:22,24
  14:2,4,20 15:1
  19:12
think 8:12 13:12
  14:23 16:19,19
  17:22 20:18 21:2
  24:2,7,12 27:13
  32:1 34:5
thought 16:5
Tim 3:10
time 5:2,14 7:18
  8:1 15:19 33:2
  35:3,4 36:9
timeline 14:21
timing 13:16
TN 37:23
today 5:1,11 9:10
  19:22 21:15,23
  29:25 30:2 33:19
  34:1
told 10:16 20:19,20
  24:17 31:21

32:13,15 33:4,17
  33:20,24 34:22
  35:1,15
top 16:6
totally 20:24
transcript 37:14
transmission 4:20
trial 24:22
true 15:17 26:6
  37:11
try 7:18,20 8:13
trying 19:7,14
turn 22:13
TV 11:14
Twelve 30:7,8
two 8:8,14 14:23
  16:15,17 30:5,6
type 30:23
typed 37:10
typewriting 4:14

**U**
U 4:1
uh-huh 8:4,7 11:20
  30:9
undercuts 20:15
understand 7:22
  16:23 17:24
  18:17 25:7 30:18
  31:3
understandable
  7:14
understanding
  17:20 18:8,19,23
  19:16 26:11,16
  27:1,2
understands 20:13
understood 7:25
United 1:4 5:8
use 8:4,9 13:15

**V**
v 1:12
Van 1:22 5:15
  20:19 24:17 32:6
  33:4 34:2,8
various 11:16
Veltrop 2:3 5:19
versus 5:6

video 5:2 7:5
videographer 2:7
  5:1,10 36:8
videotaped 1:1 4:2
views 18:2
vulnerable 15:12

**W**
Wagner 1:18 4:7
  5:22
waived 4:22
Wallace 12:10
want 6:21,23 11:21
  18:6 20:22 23:20
  23:24 31:13 32:3
  32:6 33:6 34:14
  36:3,4
wanting 18:8
waste 33:1
way 8:8 15:22
website 12:21
week 8:23
west 29:8
we'll 8:16 20:2
  32:16 36:8
we're 7:3,17,24 8:5
  8:12 20:3,23
  24:16,25 26:7
  32:7 33:7 34:2,14
  34:17,21 36:5,7
we've 19:8,24
  35:12,22
willing 29:15 30:15
witness 4:3,21,22
  6:2 7:5 8:20,21
  9:17 10:25 11:21
  11:24 15:9 28:15
  28:18 29:19
  31:22 33:3 37:19
wondering 29:19
words 8:6
worked 9:4
Wright 19:20
writing 20:21
  25:12
written 8:6
wrong 16:7 24:14

**X**

X 3:1,6

**Y**
Yeah 7:2 10:25
years 9:6

**$**
$6 31:9
$70,000 26:24 27:3
  27:14,23

**0**
06103-3702 2:4
09-61625-CIV-C...
  1:13

**1**
1 1:2 3:7 21:7,10
  37:10
1st 4:5 5:2 30:2
10/3/11 3:10
1000 1:24
101 1:19 4:7
11-MD-0222-CO...
  1:6
116 37:23
15 9:6 35:23

**2**
2 3:8 22:4,9 23:10
2nd 37:20
2012 1:2 4:5 5:2
  37:20
21 3:7
22 3:9
249 1:19 4:7
2712 6:11
2901 1:24

**3**
3 3:10 32:20,22
  33:9
30 35:13
30th 30:1
32 3:11
37 37:10
37923 1:19

**4**
4:07 4:6 5:3

45 35:15,24

**5**
5/09/2012 37:25

**6**
6 3:3

**8**
850 12 1:25

**9**
90 2:4

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of Tennessee

| | |
|---|---|
| Allison Nelson, et al. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 11-MD-02222 |
| Mead Johnson & Company, LLC; | ) |
| Enfamil Lipil Marketing and Sales Practices Litigation | ) (If the action is pending in another district, state where: |
| *Defendant* | ) Southern District of Florida ) |

### SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:  Sandra M. Pack

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization that is *not* a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

Objections to the Enfamil Lipil Marketing and Sales Practices Litigation Settlement 11-MD-0222

| Place: 249 N. Peters Rd., Suite 101 | Date and Time: |
|---|---|
| Knoxville, TN 37923 | 02/28/2010 9:00 am |

The deposition will be recorded by this method:   Video

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

All documents used to support your objections to the Enfamil Lipil Marketing and Sales Practices Litigation Settlement 11-MD-02222.

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date: _____

| *CLERK OF COURT* | |
| | OR |
| _____ | _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*       Allison Nelson
_____ , who issues or requests this subpoena, are:

William Wright, 301 Clematis Street, Suite 3000, West Palm Beach, FL, 33401
willwright@wrightlawoffice.com
561-514-0904

EXHIBIT

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  11-MD-02222

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____.

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                          *Server's signature*

                                          _____
                                          *Printed name and title*

                                          _____
                                          *Server's address*

Additional information regarding attempted service, etc:

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).



## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### MDL NO. 11-MD-02222-COHN/SELTZER

| | | |
|---|---|---|
| IN RE:   ENFAMIL LIPIL MARKETING AND SALES PRACTICES LITIGATION | ) ) ) ) ) | |
| | ) | MDL-2222 |
| This Document Relates to: | ) ) | |
| *Nelson v. Mead Johns & Company, LLC* No. 09-61625-CIV-COHN/SELTZER | ) ) ) ) | |

FILED BY

2011 AUG 22 AM 10:19

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA.-FTL

### STATEMENT OF OBJECTION TO PROPOSED SETTLEMENT AND INCORPORATED MEMORANDUM SUPORTING OBJECTION

NOW INTO COURT COMES Class Member and Objector, Sandra M. Pack ("Mrs. Pack"), by and through counsel, pursuant to the Court's Order Preliminarily Approving Class Action Settlement, Conditionally Certifying the Class, Providing for Notice and Scheduling Order dated March 18, 2011, and Rule 23(d) of the Federal Rules of Civil Procedure, and submits this Statement of Objection to Proposed Settlement and Incorporated Memorandum Supporting Objection.

Mrs. Pack is a citizen and resident of Knox County, Tennessee.  Her address is 1803 Water Mill Trail, Knoxville, TN 37922.  She does not have a home phone number.  In order to satisfy the requirement that she provide her signature in on her objection, Mrs. Pack hereby tenders as **Collective Exhibit 1** (1) a copy of her completed claim form verifying she is a Class member and (2) an original "Signature of Class Member/Objector", both of which were signed personally by Mrs. Pack.

As set forth in more detail below, Mrs. Pack objects to the settlement as well as Class Counsel's request for attorneys' fees in the amount of Three Million Five Hundred Thousand Dollars ($3,500,000.00).

## I.   INTRODUCTION

Plaintiffs allege Defendant falsely represented to consumers that its Enfamil LIPIL® baby formula was the only formula containing docosahexaenoic acid and arachidonic acid which promote brain and eye development in infants.  According to the Amended Complaint (*09-cv-61625-JI, dkt 139, ¶11*), "Defendant's Enfamil LIPIL was a leading brand of infant formula, with approximately $2.8 billion in sales in 2008."  Assuming similar sales during the 4 ½ year class period, Enfamil LIPIL sales by Defendant total approximately $12.5 Billion.

Plaintiffs further allege that Enfamil LIPIL is sold at a "hefty premium" and "faces tough competition from lower-priced store brands and private label product."  (Id. ¶3).  Objector Lisa Wallace Grossman has advised the Court that Enfamil was 20% higher than its competitors.[1]  Assuming Ms. Grossman's 20% premium is a reasonable estimate of the unwarranted price differential, damages to the class as a whole would be $2.52 Billion.

Numerous lawsuits were filed across the United States, which were ultimately transferred to this Court pursuant to the 28 U.S.C. §1407.

The parties have reached a proposed settlement, which this Court has preliminarily approved.  Under the proposed settlement, Class Members will collectively receive between $8,000,000 and $12,000,000 in cash or Enfamil Premium® Infant formula ("Infant Formula");

---

[1] *11-md-02222-JI, dkt. 51.* ("It was about $24 a can. This was a good 20% more than the less expensive, but equally nutritious, alternatives. Roughly, our family was 'guilted' by Enfamil, out of approximately $170 over the twelve months.")

specifically, a Class Member who purchased Enfamil LIPIL for six months or less is eligible to receive $6.00 in cash or one (1) 12.5 oz. container (or the nearest equivalent) of Infant Formula, and a Class Member who purchased Enfamil LIPIL for more than six months is eligible to receive $12.00 in cash or two (2) 12.5 oz. containers (or the nearest equivalent) of Infant Formula.  However, as explained in the Notice to Class Members, "if the value of Infant Formula (valued at retail) and cash actually claimed by Class Members exceeds $12 Million, then benefits will be reduced proportionally."[2]  Importantly, lawyers for the Plaintiffs have also negotiated for Defendant to pay additional monies which are not available for distribution to Class Members, specifically a $3,500,000 attorneys' fee, $140,000 in expenses and $23,000 collectively in incentive payments to the named plaintiffs.

As set forth below, Objector objects to the proposed settlement for five primary reasons. First, the proposed settlement is inadequate.  Second, the allocation of the settlement among Class members who choose to receive Infant Formula and those who prefer cash is unfair, and the unfairness is potentially exacerbated by the unclear mechanisms by which compensation will be "reduced proportionally" in the event claims exceed $12 Million.  Third, the potential *cy pres* distribution of any portion of the settlement in this case is improper.  Fourth, the requested attorneys' fees are excessive and should be included in the funds available for distribution to Class members.  Fifth, the notice to class members regarding their right to object to the fees and expenses sought by Class Counsel is fundamentally flawed to such an extent that it violates due process and Rule 23, such that additional notice is required.

---

[2] If claims are less than $8,000,000, rather than provide additional compensation to Class members, Defendant will pay the remainder in its products to undefined charities.

## II.   STANDARD OF REVIEW

### A.   Standard for Approving Class Action Settlements in General

A district court may approve a settlement only if it is "fair, reasonable, and adequate."

Fed. R. Civ. Proc. 23(e)(1)(C).  The Supreme Court has emphasized that the predominant

concern for the district court when reviewing a proposed class action settlement should be to

protect absent class members. *Amchem Prods., Inc. v. Windsor*, 117 S. Ct. 2231 (1997).

Absent class members have little at stake and thus insufficient incentive to closely

monitor class counsel and his strategic choices. *See, Mars Steel Corp. v. Continental Ill. Nat 'l*

*Bank & Trust Co., 834 F.2d 677, 681 (7th Cir. 1987).* Accordingly, the role of the District Courts

in evaluating proposed settlements is akin "to the high duty of care that the law requires of

fiduciaries." *Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 280 (7th Cir. 2002).*  District

Courts must "exercise the highest degree of vigilance in scrutinizing proposed settlements of

class actions." *Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 *F.3d* 646, 653 *(7th Cir.*

*2006)* quoting *Reynolds, 288 F.3d at 279.*

Rule 23(e) provides no specific guidance on how courts assess the fairness of class action

settlements.  However, the Eleventh Circuit has set forth six factors to consider "[i]n determining

whether the proposed settlement protects the interests of the absent class members" and is fair,

adequate, and reasonable:

> (1) the likelihood of success at trial; (2) the range of possible
> recoveries; (3) the point on or below the range of possible
> recoveries at which the settlement is fair, adequate and reasonable;
> (4) the complexity, expense and duration of litigation; (5) the
> substance and degree of opposition to the settlement; and (6) the
> stage of the proceedings at which the settlement was achieved.

4

*Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 258 F.R.D. 545, 558-59 (N.D. Ga. 2007), quoting *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).  See also, Klonoff, Robert H., *Class Actions and Other Multi-Party Litigation*, p. 192-3 (West 1999).

Courts have demonstrated an appropriately higher level of scrutiny of certain class action settlements. In particular, Courts are highly skeptical of settlements using in kind payments as the primary means of compensating class members, see, *In re Mexico Money Transfer Litig.*, 267 F.3d 743 (7th Cir. 2001), and/or lower compensation to certain class members, see *In Re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig. ("G.M. Trucks)*, 55. F. 3d 768, 808 (3d. Cir. 1995) ("One sign that a settlement may not be fair is that some segments of the class are treated differently from others.")

Turning to the issue of notice, "class actions, as other cases, are subject to the requirements of due process." *Twigg v. Sears & Roebuck & Co.*, 153 F.3d 1222, 1226 (11th Cir. 1998).  The Eleventh Circuit has explained the due process requirements of advising absent class members of their rights as follows:

> "The essence of due process is that deprivation of life, liberty, or property by adjudication be preceded by *notice* and opportunity for a hearing appropriate to the nature of the case." *In re Nissan Motor Corp. Antitrust Litig., 552 F.3d 1088, 1103 (5th Cir. 1977) (citation and quotations omitted) (emphasis added).* See also *In re Gen. Am. Life. Ins. Co. Sales Practices Litig., 357 F.3d 800, 804 (8th Cir. 2004)* (stating, in the context of a class action, that "[t]he most important element of due process is adequate notice."). Our predecessor circuit has stated that "[t]o satisfy this principle, it is not only necessary that the notice reach the parties affected but that it convey the required information." *Nissan, 552 F.3d at 1103 (citations omitted).* The notice sent to class members must inform them whether "claims like [theirs] were litigated in the [earlier] action." *Twigg, 153 F.3d at 1228.* In addition, the class members' "substantive claims must be adequately described [and] the notice must also contain information reasonably necessary to make a

5

decision to remain a class member and be bound by the final judgment." *Nissan, 552 F.3d at 1104-05*. In reviewing the class notice to determine whether it satisfies these requirements, "we look solely to the language of the notices and the manner of their distribution." *Twigg, 153 F.3d at 1227*.

*Adams v. Southern Farm Bureau Life Ins., 493 F.3d 1276, 1285 (11th Cir. 2007).*

## III. STATEMENT OF SPECIFIC OBJECTIONS

### A. THE SETTLEMENT IS INADEQUATE

In determining whether the monetary relief in a proposed class action settlement is adequate, district courts are instructed to compare the settlement to "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing." *G.M. Trucks*, 55 F.3d at 806 (quoting *Manual for Complex Litigation 2d*). "This inquiry measures the value of the settlement itself to determine whether the decision to settle represents a good value for a relatively weak case or a sell-out of an otherwise strong case." *In re Chambers Dev. Sec. Litig.*, 912 F. Supp. at 839. 912 F. Supp. 822, 839 (W.D. Pa. 1995). See also, *G.M. Trucks*.

The settling parties bear the burden of proving the reasonableness of a proposed settlement. *Holmes v. Continental Can. Co., 706 F.2d 1144 (11th Cir. 1983)*. The court must conduct its own independent analysis of the settlement terms, rather than accept the parties' biased opinions, conclusions and assurances.[3] *In re Pet Food Prod. Liab. Lit.*, 629 F.3d 333 (3rd Cir. 2010); see also, *Reynolds*, 288 F.3d at 283 (cautioning against "paint[ing] with too broad a brush [and] substituting intuition for . . . evidence and careful analysis").

---

[3] Plaintiffs remarkably rely upon a footnote in *Leverso* v. *Southtrust Bank Nat 'l Ass'n*, 18 F.3d 1527 (11th Cir. 1994) for the proposition that this Court should blindly accept the opinions of Class Counsel in determining the adequacy of the settlement. However, the footnote merely refers to the factors considered by the District Court as part of the history of the litigation. To be sure, *Leverso* does not support the proposition that the district court should merely follow the opinions of Class Counsel. Further, in *Leverso* the Eleventh Circuit determined the trial court judge had abused his discretion and *reversed* the lower court's opinion.

"Reliance on counsel's opinion tends to render the district court captive to the attorney and fosters rubber stamping by the court rather than the careful scrutiny which is essential in judicial approval of class action settlements. Such a practice offers the same host of dangers that underlies the evidentiary rule against the admissibility of hearsay testimony. The objectors and the court must judge the evidence second hand and determine the credibility, not of the actual witnesses, but of the attorney for such witnesses." *Holmes, 706. F. 2d at 1150.*

Despite bearing the burden of "developing a record" regarding the fairness and adequacy of the settlement, *Holmes, 706. F. 2d at 1147,* the parties have provided little or no facts or data to the Court and absent Class members. For example, Plaintiff's Memorandum filed in support of the settlement (*11-md-02222-JI, dkt # 54-1*) contains *not one word* regarding the possible damages award in this case. Moreover, Class Counsel severely overstates the prospect of Mead Johnson successfully defending this case on the merits. After all, in a case brought successfully against Mead Johnson by PBM Products, LLC (Mead Johnson's competitor in the baby formula market), a jury has already determined that its advertisements were false.[4]

Make no mistake, if well prosecuted, this is very good lawsuit for the Class. There is a roadmap for proving liability through the *PBM* case. There are significant damages, not to mention the availability of treble damages and attorneys' fees. Given these factors, the relatively minimal settlement (which includes a cumbersome claims process and reduced compensation to class members preferring cash to baby formula) is inadequate. More importantly, the parties have not met ***their burden*** to prove the settlement is adequate.

---

[4] Although it appealed, Mead Johnson did not attack the jury's determination that it had engaged in false advertising of Enfamil LIPIL. The Fourth's Circuit's opinion characterizes the issues on appeal as "(1) whether the district court erred in its dismissal of Mead Johnson's counterclaims; (2) whether the district court abused its discretion in its admission of expert opinion testimony and evidence of prior litigation between the parties; and (3) whether the district court erred or abused its discretion in issuing [an] injunction." *PBM Products, LLC v. Mead Johnson & Co. 639 F.3d 111 (4th Cir. 2011).*

Mrs. Pack believes under the proposed structure a reasonable settlement would be 40-50% of potential damages (including treble damages and attorney fees.) See, *Van Horn v. Nationwide Prop. & Casualty Co. 2010 U.S. Distr. LEXIS 42357 \*19 (N.D. Ohio, April 30, 2010) (characterizing fifty percent recovery as a "good result" but not "an extraordinary one.")*

## B. THE ALLOCATION OF THE SETTLEMENT PROCEEDS IS UNFAIR

"Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate." *In re Computron Software Inc., 6 F. Supp. 2d 313, 321 (D.N.J. 1998)*. See also, *Holmes, 706. F. 2d at 1147*, recognizing that "[w]hile most cases deal with the fairness of the total settlement as between the defendant and the class as a whole, the same legal principles apply 'with as much force' to appellate review of the allocation agreement as to review of the settlement between plaintiffs and defendants (citing *In re Chicken Antitrust Litigation,* 669 F.2d at 238 and *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 218-21 (5th Cir.1981), *cert. denied,* 456 U.S. 98, 1012.

"Courts generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable." In re Aetna, 2001 WL 20928, at \*12 (citing *In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166, 184 (E.D. Pa. 2000).

In this case, not only is the settlement amount low, but the allocation is unfair. Class members who choose the option of receiving cash will be shortchanged. The cash payment is $6.00 or $12.00; whereas the retail price of a single 12.5 oz. can of Enfamil Premium is approximately 14.00. Mrs. Pack and other Class Members preferring cash receive less than ½ that value that other Class members choosing to receive Enfamil Premium.

8

Class members should not be forced to accept product they do not need or want in order to be on equal footing with other Class members. Nor, should they be forced to do business with a company that deceived them to obtain the full benefits of the settlement.

Moreover, if the claims exceed $12 Million such that the benefits are "proportionately reduced," Class members choosing to receive cash may be shortchanged even more. For example, if benefits are proportionately reduced 20%[5], the $6.00/$12.00 payment becomes $4.80/$9.60. But, what about the reduction in Infant Formula – would those choosing to receive Infant Formula receive 20% less formula (i.e. a 10 oz. container)? Mrs. Pack and her counsel understand that Defendant does not currently manufacture a 10 oz. container[6], and it is highly unlikely Mead Johnson will manufacture a special 10 oz. container simply to fulfill the settlement. Rather, Defendant will in all likelihood give Class members choosing Infant Formula the full benefit of the settlement and only reduce the cash payments. Of course, at this point, many Class members' children will have outgrown the need for formula anyway.

Further, because there are no restrictions on Defendant's ability to change the size of Infant Formula containers it markets and sells or the retail price of its product, the amount payable to Class members choosing cash is subject to change. Defendant could, for example, raise the retail price of the Infant Formula by selling larger containers[7] and/or increasing its prices, which would have the potential effect of lowering the cash it is required to pay.

---

[5] The 10% reduction if for illustration purposes only. Of course, no one can predict the size of the reduction, if any.
[6] According to Defendant's website, the 12.5 oz. is the *smallest* size container of Enfamil Premium powder currently sold by Defendant, with the exception of single serving packets.
http://www.enfamil.com/app/iwp/enf10/content.do?dm=enf&id=/Consumer_Home3/Infants/EnfamilPremiumInfant&iwpst=B2C&ls=0&csred=1&r=3490614741

[7] Exhibit H to the Complaint demonstrates that Mead Johnson previously sold its product in 12.9 oz. containers, so clearly the size of the container is subject to change.

9

For example, suppose there are a total of 1,000,000 class members who submit claims, all of whom purchased Enfamil LIPIL for more than 6 months; 200,000 class members choose to receive Infant Formula; and, 800,000 choose to receive cash. At a retail price of $14.00 per container, the total claims are $15.2 million.[8]   The pro rata reduction would be 21% ($12 Million ÷ $15.2 Million = 79%, meaning each claimant will receive 79% of the claim and the "proportionate" reduction is 21%); the cash distribution is thus reduced from $12.00 to $9.48 ($12.00 X .79 = $9.48).

But, if due to inflation or other factors the retail price of the container rises to $17.50[9], the total claims become $16.6 Million.[10]   In turn, the pro rata reduction becomes 28% ($12 Million ÷ $16.6 Million = 72%, and the cash distribution is further to $8.64 ($12.00 X .72 = $8.64). But, the Class members choosing to receive Infant Formula likely will not suffer any loss for the reasons described above; that is, Mead Johnson will not specially manufacture a 9 oz. container any more than it would specially manufacture a 10 oz. container. Accordingly, Class members choosing to receive product, in effect, will have their compensation increased because they will receive a product with a higher retail price.

The bottom line is that if prices for Enfamil Premium rise, ironically the only class members harmed will be those who obviously have no desire or need for baby formula and who are effectively forced to accept a smaller amount of cash.[11]

---

[8] Under that scenario, total claims are calculated as follows:
Cash Claims = 800,000 X $12.00 = $9,600,000.
Infant Formula Claims = 200,000 X $28 = $5,600,000.
Total Claims = $9,600,000 + $5,600,000 = $15,200,000.

[9] This equates to a 25% price increase.

[10] Under this scenario, total claims are calculated as follows:
Cash Claims = 800,000 X $12.00 = $9,600,000.
Infant Claims = 200,000 X $35 = $7,000,000.
Total Claims = $9,600,000 + $7,000,0000 = $16,600,000.

[11] Mrs. Pack suggests that one method to at least partially remedy the inequitable allocation is to value Infant Formula at Mead Johnson's cost of production, rather than the retail price.

## C.   THE POTENTIAL *CY PRES* DISTRIBUTION IS IMPROPER

Mrs. Pack also objects to any potential distribution of infant formula to unnamed charities as part of the settlement. A *cy pres* distribution should only be made after all Class members who file claims are compensated *in full* – which will certainly not occur under the proposed settlement. [12]

A *cy pres* remedy is appropriate only where *excess* class recovery – i.e. funds remaining after all class members have been *fully compensated* - cannot feasibly be distributed to individual class members or where unclaimed funds remain following distribution to the class. See *In re Pharmaceutical Industry Avg. Wholesale Price Lit., 588 F.3d 24 (1st Cir. 2009)* (approving *cy pres* of unclaimed funds because district court had ensured full treble recovery of class members first), *Molski v. Gleich, 318 F.3d 937 (9th Cir. 2003)* (rejecting a proposed consent decree because the *cy pres* award replaced individual damages) and *In re Matzo Food Products Litigation, 156 F.R.D. 600 (D.N.J. 1994)* (refusing to approve class settlement with only *cy pres* distribution), *Government Employees Hosp. Ass'n v. Serono Intern., S.A., 246 F.R.D. 93, (D. Mass. 2007)*.

In this case, Class members will not be *fully* compensated. Further, the settlement at issue here already contains a method to distribute funds to class members. Using *cy pres* to benefit third-parties instead of class members is inappropriate. In short, there is no defensible reason to have any *cy pres* distribution in this settlement until reasonable measures are taken to ensure that the Class members (or alternatively all Class members who file claims) are completely compensated to the fully extent allowed by law.

---

[12] Mrs. Pack does not challenge the propriety of *cy pres* awards in limited circumstances, despite the inherent conflicts such distributions create. See, e.g., Martin H. Redish, et al., Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis, 62 Fla. L. Rev. 617 (2010).

**D.  THE $3,500,000 PORTION OF THE SETTLEMENT ATTRIBUTATBLE TO ATTORNEY FEES SHOULD BE INCLUDED IN THE FUNDS DISTRIBUTABLE TO CLASS MEMBERS, AND THE FEES REQUESTED BY CLASS COUNSEL ARE EXCESSIVE.**

A fundamental problem with Class Counsel's proposed settlement is the improper and conflicting manner in which Class Counsel accounts for the $3,500,000, which Class Counsel separately negotiated for their fee.  Moreover, the fee requested fee is excessive.

Although the amount of attorneys' fees to be awarded in this case is generally within the Court's discretion, "a judge's discretion [on the issue of attorneys' fees] is not unlimited." Hardt v. Reliance Standard Life Ins. Co., — U.S. — , 130 S. Ct. 2149, 2158 (2010).  Specifically, when a district court commits an error of law in deciding how to exercise its discretion, that court has, by definition, abused its discretion. *United States v. Brown, 332 F.3d 1341, 1343 (11th Cir. 2003)* ("A district court by definition abuses its discretion when it makes an error of law." quoting *Koon v. United States, 518 U.S. 81, 100, 116 S.Ct. 2035, 2047 (1996)*).

1.  *The $3,500,000 belongs to the Class members, not Class Counsel.*

Make no mistake - the rights of Class members in this case (specifically the *Nelson* case) include a claim for attorneys' fees

> (1) In any civil litigation resulting from an act or practice involving a violation of this part, except as provided in subsection (5), the prevailing party, after judgment in the trial court and exhaustion of all appeals, if any, may receive his or her reasonable attorney's fees and costs from the nonprevailing party.

> (2) The attorney for the prevailing party shall submit a sworn affidavit of his or her time spent on the case and his or her costs incurred for all the motions, hearings, and appeals to the trial judge who presided over the civil case.

(3) The trial judge may award the prevailing party the sum of reasonable costs incurred in the action plus a reasonable legal fee for the hours actually spent on the case as sworn to in an affidavit.

(4) Any award of attorney's fees or costs shall become a part of the judgment and subject to execution as the law allows.

Florida Statutes §501.2105. [13]

Importantly, any fee award under this statute is payable to prevailing party – not the prevailing party's attorney. *Turner v. Sec. of the Air Force, 944 F.2d 804 (11th Cir. 1991)* (fee shifting statutes were "not passed for the benefit of attorneys but to enable litigants to obtain competent counsel worthy of a contest with the caliber of counsel available to their opposition" citing *Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 719 (5th Cir.1974)*, such that "it is clear that the award of attorneys' fees belongs to the prevailing party, not to the attorney representing the party.") See also, *Astrue v. Ratliff, 130 S. Ct. 2421, 2125 (2010)* ("*prevailing party is a 'term of art' and that refers to the prevailing litigant.*") and *United States, ex. Rel. Virani v. Jerry M. Lewis Truck Parts & Equip., 89 F. 3d 574, 577 (9th Cir. 1996)* ("*The Supreme Court has made in clear that, in general, statutes bestow fees on parties, not upon attorneys.*")

By classifying this matter as a "common fund" case, Class Counsel seems to acknowledge the $3,500,000 is first and foremost payable to the Class. But Class Counsel wants to have their cake and eat it too.

One the one hand, Class Counsel asks the Court to grant them a percentage of the common fund; but on the other hand, in the notice regarding the proposed settlement, Class Counsel advised Class members that the Court's award of fees "will not affect the value of the

---

[13] Rights to attorneys' fees are generally available under unfair and deceptive trade practices statutes or similar laws in every state.

Settlement proceeds to be distributed to the Class."

https://formulasettlement.com/FrequentlyAskedQuestions.aspx[14]

Moreover, it is noteworthy that while the lawyers needed 2 mediations and 8 months to settle the claims of the Class, the parties allegedly negotiated the $3.5 Million fee in one week or less. *Blood Dec. ¶18 ("The Parties did not negotiate the issue of Plaintiffs' Counsel's attorneys' fees and reimbursement of expenses until after agreement on the substantive aspects of the Settlement. These negotiations took place during the week of March 6, 2011.")* There is no indication that defense counsel reviewed the number or hours incurred by Class Counsel or their hours. [15]

Unquestionably, any award of attorneys' fees is first and foremost payable to the parties – in this case the Class. Accordingly, the proposed settlement, if approved, should be viewed as a fund of between $11.5 Million to $15.5 Million, all of which is available for distribution to Class members, reduced only by the fees, expenses and incentive awards approved by this Court.

   2.   *Class Counsel's Lodestar is Excessive. Specifically, The Lodestar Should be Calculated Based Solely Upon the Number of Hours Worked by the Attorneys for Allison Nelson.*

---

[14] The "Frequently Asked Questions" section of the settlement website states:

**17. How will the lawyers be paid?**

Answer:

Class Counsel in the Nelson case and Plaintiffs' counsel in the seven other similar cases that will be resolved by this Settlement have not received any payment for their services in conducting the litigation on behalf of the Class Representative and the Members of the Class. If the Settlement is approved by the Court, Mead Johnson has agreed to pay attorneys' fees in the amount of $3.5 million and expenses not to exceed the amount of $140,000, subject to the approval of the Court. Any award will cover the fees and expenses for the attorneys in the eight cases filed against Mead Johnson. Any fees and expenses awarded to these attorneys by the Court will be paid by Mead Johnson and will not affect the value of the Settlement proceeds to be distributed to the Class. (emphasis added)

[15] Given the quick negotiation and lack of any indication of critical flyspecking of Class Counsels' hours/rates, one is apt to wonder whether there might have been an understanding all along that the negotiated fee was going to 25% of the overall recovery.

Class Counsel has provided very few details regarding work performed by the numerous law firms seeking payment, and likely with good reason. The work was necessarily fraught with duplication which did not benefit the Class or otherwise improve the settlement. But, of course, as with all class action settlements none of the parties seeking approval of this settlement have any interest or incentive in highlighting the excessive fee and as expected, have present the proposed settlement to both the class and the court in the most favorable light, downplaying any possible weaknesses or problems with the deal. *See, Amchem,* 521 U.S. at 621.

Mead Johnson wants the case to be resolved, the named plaintiffs want their incentive award, and the Plaintiffs' attorneys want to be paid.[16] In the absence of an adversarial proceeding, the court is poorly situated to uncover any potential conflicts between class counsel and the class, or among various class members, or to otherwise assess the fairness of the proposed settlement. Hence, the significance of hearing the contentions of objectors, and the duty of the court to fully explain their objections on the record. *Waters v. City of Chicago,* 420 N .E.2d 599 (Ill. App. 1981). After all, it has been said that objectors are the *only* parties with an incentive to uncover flaws in the proposed settlement. Wasserman, R., *Dueling Class Actions,* 80 B. U. L. Rev. 461, 483 (April 2000).

This matter was not consolidated by the Judicial Panel on Multidistrict Litigation until February 2011 – the exact same time when Mr. Blood was purportedly finishing his settlement negotiations. *Dec. of Timothy G. Blood ("Blood Dec."),* :09-cv-61625-JIC dkt 138-2, ¶17. Because Mr. Blood was concluding his negotiations when this case became a MDL, clearly the other firms seeking payment had absolutely zero involvement in reaching the settlement. In the

---

[16] Understandably, counsel in the *Nelson* case must ensure the other lawyers are paid, or else run the risk that they will file objections and jeopardize the settlement.

end, their involvement did not improve the settlement any. Yet, they seek a substantial portion of the settlement funds.

The Declaration of David Pastor (*11-md-02222-JI, dkt 54-6, "Pastor Dec"*) is a good example. He describes his work and the work of his firm as follows:

> 5. My firm was counsel for plaintiffs in two actions that are part of MDL No. 2222, *Martin* v. *Mead Johnson Nutrition Company*, No. 09-11609-NMG (D. Mass.) and *Kaplan* v. *Mead Johnson Nutrition Company*, No. 09-644 (M.D. Fla.). My firm conducted substantial legal and factual research relating to the drafting of the complaints, amended complaints, and the statutory demand letter under the Massachusetts consumer protection act and also conducted additional research and investigation during the overall prosecution of our cases. We also consulted with clients and consultants; attended motion hearings and status conferences; briefed and argued motions to dismiss and objections to the Report and Recommendation of the Magistrate Judge, including factual research and investigation regarding jurisdictional issues. We also reviewed substantial documents in the ordinary course of prosecuting our actions and preparing our class certification submissions; participated in case management conferences with defendants' counsel; and prepared papers in response to MDL motion for transfer.

Mr. Pastor's efforts do not appear to have resulted in any benefit to the Class. He did not participate in any mediation or negotiation of the proposed settlement. And, although he claims to have "consulted with [clients and] consultants," the expenses of his firm (*Pastor Dec. ¶7*) reflect that $0.00 was spend on "Expert/Consultants!" With due respect to Mr. Pastor and the other co-counsel, each appears to have simply filed a "copycat" lawsuit on the heels of the PBM case against Mead Johnson which was being fought in Virginia's federal "rocket docket." There is no evidence that Mr. Pastor or other co-counsel performed any task that was not duplicative of the work performed by Mr. Blood and the other lawyers who filed the *Nelson* case.

Because the attorneys for Allison Nelson appear to have prosecuted and resolved this case solely on their own, only their fees and expenses should be considered by the Court.[17]

### 3.   *The Hourly Rates Used in the Lodestar Calculation Should be The Prevailing Market Rate for Fort Lauderdale, Florida*

This Court should calculate a lodestar based upon the prevailing rates in this venue, not what Class Counsel might receive in higher priced markets such as California and Massachusetts. "The hourly rate must be determined with reference to prevailing market rates in the relevant community." *Davis v. Locke, 936 F.2d 1208 (11th Cir.1991).* The prevailing party bears the burden of justifying the rate requested. *Id. at 1215.*

In this case, Class Counsel has not established the prevailing market rate, but the rates charged by Mr. Wright may be instructive. If this Courts finds that in cases pending in this venue he and his firm typically receive the rates set forth in his Declaration ($450.00/hour for Sr. Partners, $350.00 for other lawyers, 175.00 for law clerks, and $150.00 for paralegals), Mrs. Pack will not object to these rates being applied across the board to all of the lawyers representing Allison Nelson.

### 4.   *Class Counsel Should Not Receive a Multiplier or Enhancement Above the Lodestar*

The United States Supreme Court in *Perdue v. Kenny A. ex. rel. Winn*, 130 S. Ct. 1662 (2010) recently reaffirmed six (6) "important rules" regarding federal fee shifting statutes. First, a reasonable fee is a fee sufficient to induce a capable attorney to undertake the representation. Second, the lodestar method yields a fee that is presumptively sufficient. Third, multipliers (or "enhancements") may be awarded only in "rare" and "exceptional" circumstances. Fourth, a Court must not award an enhancement based on a factor that is subsumed in the lodestar calculation; therefore, the complexity of a case or the quality of counsel's performance generally

---

[17] In addition, only Allison Nelson should receive an incentive award.

may not be used to justify an enhancement because these factors should be fully and adequately addressed by hours recorded by counsel and counsel's hourly rate respectively.  Fifth, the fee applicant bears the burden of proving that an enhancement is justified.  Finally, an attorney requesting an enhancement above the lodestar must set forth "specific evidence" to support the award.

At a minimum, *Perdue* is persuasive authority for this Court.  At least one federal court has applied to a "common fund" case under state law.  "Although decided in the context of statutory fee shifting under 42 *U.S.C.* §1988, *Perdue* nevertheless provides persuasive caution that multipliers must be reserved for "rare" and "exceptional" circumstances. *[citation omitted]* Although this Court does not read *Perdue* to prohibit the use of multipliers in class actions, the case does suggest that enhancements are atypical and should not duplicate the same considerations affecting the lodestar rate." *Van Horn 2010 U.S. Dist. LEXIS 42357 *16*[18]

Because the proposed settlement if far from "exceptional," the attorneys for Ms. Nelson should not receive any multiplier or enhancement.

E.    **THE NOTICE TO CLASS MEMBERS OF CLASS COUNSEL'S MOTION FOR FEES, EXPENSES AND INCENTIVE AWARDS WAS FLAWED**

"[P]rocess which is a mere gesture is not due process." *Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).* "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford

---

[18] The Court in *Van Horn* applied a 20% enhancement to the lodestar, but only after reducing class counsel's hourly rates by 20% because the requested rates were deemed too high for that venue.

them an opportunity to present their objections." *Mullane, 339 U.S. at 314 (internal citations omitted).* [19]

In this case, with regard to their application for attorneys' fees, it is clear that Class Counsel simply went through the motions and made no real effort to adequately notify Class members. Counsel did not place the motion and memorandum on the website dedicated to this matter. Further, despite knowing of the fact that Mrs. Pack was being represented by undersigned counsel and having a physical address, fax number and email address, Class Counsel did not forward a copy of their motion. In fact, Class Counsel took affirmative action to prevent Mrs. Pack from easily accessing their motion and memorandum by objecting to her counsel's request for ECF privileges in this case.

Even the limited notice to Class members was defective and failed to comply with Rule 23(h). Notice under Rule 23 must be structured "in a manner that enables class members rationally to decide whether they should intervene in the settlement proceedings or otherwise make their views known." *Reynolds v. National Football League*, 584 F.2d 280, 285 (8th Cir.1978). As explained above, the attorneys' fees should have been included in the funds distributable to the Class. Accordingly, the Notice should have advised class members (1) that any amount paid to the attorneys would reduce the funds available for distribution to the Class, and (2) that Class members had the right to object Class Counsel's fee request.

Not only did the Notice fail to notify the Class of this information, it misled Class members by advising them that "[a]ny fees and expenses awarded to these attorneys by the Court

---

[19] In addition, Rule 23(h) explicitly requires that notice of the motion for fees and expenses be "directed to class members in a reasonable manner." See, *In re: Mercury Interactive Corp. Securities Litigation, 618 F. 3d 988 (9th Cir. 2010)* (a district court errs as a matter of law - and thus abuses its discretion - when it sets the objection deadline for class members <u>before</u> the deadline for class counsel to file its motion for attorneys' fees and costs.)

will be paid by Mead Johnson and will not affect the value of the Settlement proceeds to be distributed to the Class."

For these reasons, the Notice (and lack thereof) in this case violated Rule 23 and due process.

### IV. REQUEST FOR PERMISSION TO SPEAK AT FAIRNESS HEARING

Undersigned counsel requests permission to speak at the Fairness Hearing, and intends to request the Court's permission to appear telephonically.

### IV. PRAYER FOR RELIEF

WHEREFORE, Sandra R. Pack, by and through counsel, prays that this Court reject the proposed settlement as inadequate. Alternatively, Mrs. Pack prays that the Court (1) reject the proposed allocation as unfair to Class members, such as herself, who will choose to receive cash instead of Infant Formula, and (2) reject any cy pres distribution of the funds.

In addition, Mrs. Pack prays that this Court order that the $3,500,000 currently payable only to Class Counsel, instead be distributable to the Class to the extent the Court-awarded fees and expenses are less than $3,500,000. Further, Mrs. Pack prays that the Court limit any award to Class Counsel for attorneys' fees to an appropriate lodestar amount, with no multiplier or enhancer, for only those lawyers representing Allison Nelson, and calculate at hourly rates not to exceed the rates typically charged and collected by William C. Wright.

Finally, Mrs. Pack requests that this Court decree that the Notice to Class members of Class Counsel request for attorneys' fees violated due process and Rule 23 and order (1) that the time for objections to Class Counsel's request for attorneys' fees and expenses be extended, (2) that Class Counsel be ordered to make a copy of its motion for attorneys' fees and expenses

available at https://formulasettlement.com/CourtDocuments.aspx and (3) that Class Counsel or

Defendant pay for additional publication notice to class members advising them that the

objection period has been extended.

Respectfully submitted this *19th* day of August, 2011.

James. H. Price
249 North Peters Road, Suite 101
Knoxville, Tennessee  37923
(865) 246-0800
*Attorney for Class Member Sandra M. Pack*

CERTIFICATE OF SERVICE

I certify that on this __19th__ day of August, 2011, a copy of the foregoing was served upon

the following:

Timothy G. Blood
Blood Hurst & O'Reardon
600 B. Street, Suite 1550
San Diego, CA 92101
*Class Counsel*

William C. Wright
The Wright Law Office, P.A.
301 Clematis Street, Suite 3000
West Palm Beach, FL 33401
*Class Counsel*

Gail Gottehrer
Axinn Veltrop Harkrider, LLP
90 State House Square
Hartford, CT 06103
*Mead Johnson's Counsel*

Parties may also access this filing through the Court's electronic filing system.


James. H. Price

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MDL NO. 11-MD-02222-COHN/SELTZER

| | | |
|---|---|---|
| IN RE: | ENFAMIL LIPIL MARKETING AND SALES PRACTICES LITIGATION | ) ) ) ) |
| | | ) |
| | | )    **MDL-2222** |
| This Document Relates to: | | ) ) |
| *Nelson v. Mead Johns & Company, LLC* No. 09-61625-CIV-COHN/SELTZER | | ) ) ) ) ) |

COLLECTIVE EXHIBIT 1 TO
SANDRA M. PACK'S STATEMENT OF OBJECTION AND
INCORPORATED MEMORANDUM SUPORTING OBJECTION

| This Claim Form must be submitted online or mailed and postmarked by **November 25, 2011.** Only one claim per household. | **CLAIM FORM**<br><br>INFANT FORMULA SETTLEMENT<br><br>Please print (or type) clearly in blue or black ink. | FOR OFFICIAL USE ONLY<br><br>01 |

Claim Forms must be submitted online or postmarked by **November 25, 2011** and mailed to:

Infant Formula Settlement
P.O. Box 2472
Faribault, MN 55021-9172

`* 9 9 9 9 9 9 9 9 9 *`

## 1. CLASS MEMBER INFORMATION

Your Name: _Sandra M. Pack_

Your Mailing Address: _1803 Water Mill Trail_

City: _Knoxville_          State: _TN_          Zip Code: _37922_

Daytime Phone: ( _865_ ) _246_ - _0800_          E-mail Address *(optional)*: _____
– _Number for my attorneys_

## 2. BENEFIT SECTION INFORMATION

| | |
|---|---|
| A. How many months between October 13, 2005 and March 31, 2010 did you purchase Enfamil LIPIL®? *(check only one box)* | ☐ Six months or less<br>☒ More than six months |
| B. In what months and years did you purchase Enfamil LIPIL®?<br>*(List by month and year range – for example, 05/2006 – 09/2006.)* | MONTH/YEAR   MONTH/YEAR<br>_03/2008_ . _03/2009_<br>___/_____ . ___/_____<br>___/_____ . ___/_____ |
| C. For each child who was fed the Enfamil LIPIL® that you purchased between October 13, 2005 and March 31, 2010, please list the child's month and year of birth' | MONTH/YEAR OF BIRTH<br>_03/2008_<br>___/_____<br>___/_____ |
| D. Which of the following Settlement benefits do you want to receive?<br>*(check only one box)* | ☒ Cash<br>☐ Enfamil Premium® Infant |
| E. For the child or children identified above, did you receive Enfamil LIPIL® through the U.S.D.A.'s Women, Infants and Children program ("WIC")? (If you identified multiple children above, only answer "yes" if true for all of them.) | ☐ Yes<br>☒ No |

## 3. SIGN AND DATE YOUR CLAIM FORM

I affirm, under penalty of perjury, that I bought Enfamil LIPIL® infant formula in the United States between October 13, 2005 and March 31, 2010, that I did not receive Enfamil LIPIL® infant formula through the U.S.D.A.'s Women, Infants and Children ("WIC") program or purchase it for purposes of resale, and that all of the information on this Claim Form is true and correct to the best of my knowledge.

_Sandra M Pack_               _Sandra M Pack_               _8_ / _2_ / _11_
Signature                              Print Name                         Month/ Day /Year

'Your personal information is being collected for purposes of the proposed Settlement and will not be used for any other purpose without your permission.

`* 2 8 7 0 *`          `* C F W *`          `* 1 - 1 *`

### SIGNATURE OF CLASS MEMBER/OBJECTOR

Pursuant to the instruction for filing objections in *In Re: Enfamil LIPIL Marketing and Sales Practices Litigation*, No. 11-MD-02222-Cohn/Seltzer, I, Sandra M. Pack, am providing my signature below to accompany the Statement of Objection to Proposed Settlement and Incorporated Memorandum Supporting Objection filed on my behalf by Lacy, Price & Wagner, P.C.

Sandra M. Pack



**From:** Allen McDonald
**To:** Tim Blood
**Subject:** Enfamil
**Date:** Monday, October 03, 2011 3:04:37 PM

Tim,

Per your request, I'm putting in writing our opening offer of $150,000 which I passed along to Howard last week.

This figure is derived from my understanding of what John Pentz settled for in other cases of similar size (attorneys' fees of between $3 and $5 Million). That is, I understand that Pentz settled for 5% in one case and a little less than 4.5% in another. Our $150,000 opening offer is roughly 4.5%.

While I agree with you that each case is different, I think our number is a more than reasonable place to start.

I look forward to hearing from you.

W. Allen McDonald, Esq.
Lacy, Price & Wagner, P.C.
249 North Peters Rd.
Suite 101
Knoxville, TN  37923
(865) 246-0800 PHONE
(865) 690-8199 FAX

IRS 230 DISCLOSURE
IRS CIRCULAR 230 REQUIRES US TO INFORM YOU THAT ANY STATEMENTS CONTAINED HEREIN ARE NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY YOU OR ANY OTHER TAXPAYER, TO AVOID ANY PENALTIES THAT FEDERAL TAX LAW MAY IMPOSE.
CONFIDENTIALITY NOTICE
THIS MESSAGE MAY CONTAIN CONFIDENTIAL OR PRIVILEGED INFORMATION. IF YOU HAVE RECEIVED IT IN ERROR, PLEASE CONTACT THE SENDER IMMEDIATELY.